R. S. Dass BADHWAR and R. B. Lachmandass Mohanlal & Sons, Ltd., composing the co-partnership doing business under the firm name and style of Mulkraj Brothers and Badhwar, Plaintiffs,

v.

The COLORADO FUEL AND IRON CORPORATION, Isbrandtsen Company, Inc., and American-Hawaiian Steamship Company, Defendants.

United States District Court
S. D. New York.

Sept. 12, 1955.

Dunn & Zuckerman, New York City, for plaintiffs, James F. Dunn and Mortimer E. Greif, New York City, of counsel.

Kelley, Drye, Newhall & Maginnes, New York City, for defendant the Colorado Fuel & Iron Corp., Francis S. Bensel and W. F. Knecht, New York City, of counsel.

Lord, Day & Lord, New York City, for defendant Isbrandtsen Company, Inc., Woodson D. Scott, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for defendant American-Hawaiian S.S. Co., William J. Tillinghast, Jr., New York City, of counsel.

RYAN, District Judge.

Plaintiffs seek in this action money damages in the amount of $203,639.09 which they claim because of defendants' improper shipment and transportation of a purchase of caustic soda and the improper issuance and negotiation of two bills of lading relating thereto.

Plaintiffs are citizens and residents of Lucknow, India; defendant Colorado Fuel and Iron Corporation is a corporation organized under the laws of the State of Colorado; defendant Isbrandtsen Company, Inc. is a corporation organized under the laws of the State of New York; and defendant American-Hawaiian Steamship Company is a corporation organized under the laws of the State of New Jersey. There is complete diversity of citizenship between all plaintiffs and all defendants and the amount in controversy exceeds the sum of $3,000, exclusive of interest and costs.[1] None of the parties questions the jurisdiction of this Court.[2]

Plaintiffs alleged in their complaint five causes of action: the first against Colorado for breach of contract; the second against all defendants for negligence in the performance of their various contractual obligations; the third against all defendants for fraud; the

1. 28 U.S.C.A. § 1332(a) (2).

2. S.M.P. 79.

**598**

fourth against Isbrandtsen and American-Hawaiian for conversion; and the fifth against all defendants for the loss of 60,203.3 pounds of caustic soda which arrived in Bombay in 526 allegedly damaged drums. The first four alleged causes of action all arose out of the same transaction or occurrence and can conveniently be considered together. We will treat these allegations and the evidence submitted in support of them as one claim determining whether plaintiffs can recover under any theory.[3] Plaintiffs' counsel has in addition presented his case in this manner.[4]

The contract[5] between the plaintiffs and Colorado came about in the following manner: At the request of Colorado the New York Branch of the National City Bank of New York cabled its Bombay Branch on August 2, 1948 that Colorado had an export license for 4,300 tons of caustic soda solid, 76% alkalinity, N. Y. & L. test, for immediate delivery at 9 cents per pound FAS Gulf Ports or 10.102 cents per pound CIF Bombay. The New York Branch asked the Bombay Branch to cable if it knew of a buyer who had an import license and who would be able to open a credit at once.[6] On the day following the Bombay Branch advised the New York Branch of the National City Bank that their contacts showed no interest in the Colorado offer, and Colorado was informed of this reply.[7] At the request of Colorado, on August 4, 1948, the New York Branch cabled the Bombay Branch to continue their endeavors to arouse interest for all or part of the 4,300 tons,[8] and on August 5, 1948 the Bombay Branch cabled the New York Branch as follows:

"Your Six Our Eight Mulkraj Interested Buy Up To Two Thousand Long Tons Caustic From Colorado Provided Price Cent 9.50 Per Pound CIF Bombay And Quality Equal To Ninetyeight Percent Noah Stop Working."[9]

The plaintiffs admit the facts stated in this cablegram to be true; Colorado admits that the contents of the cablegram were communicated to it. On that same day (August 5th) the New York Branch cabled the Bombay Branch that Colorado's best price was 10 cents per pound CIF Bombay.[10] Plaintiffs admit that the contents of this cable were communicated to them. On August 6th the Bombay Branch cabled the New York Branch that plaintiffs insisted upon the 9½ cent price, CIF Bombay, and Colorado admits that it was informed of the contents of this cable.[11] On August 6th, a Friday, at the request of Colorado the New York Branch cabled the Bombay Branch the following:

"Urgent Your Eleven At Request Colorado Fuel & Iron Corporation And Without Responsibility To Bank Advise Mulkraj Quote Colorado Fuel & Iron Agree Sale Two Thousand Long Tons Caustic Soda Solid 76% Alkalinity NY&L Test Packed Steel Drums Price Nine And One Half Cents Per Pound CIF Bombay Payable U. S. Dollar Irrevocable Letter Of Credit Stop In Order To Expedite Validation Of Export License Number Please Have Buyer Cable Confirmation Stating Their Import License Number And Full Name Address Direct To W. A. Bartle Care Of Colorado Fuel & Iron Corporation 1616 Eye

3. Fed.R.Civ.P. 15(b), 28 U.S.C.A.

4. E. g. S.M.P. 70, 77–78.

5. The law of the State of New York is being applied as to whether or not any contract was in fact made by the plaintiffs and Colorado, and as to the construction of that contract upon agreement of counsel for the respective parties. S.M.P. 80.

6. Plaintiffs' Exhibit 1, Schedule A.

7. Plaintiffs' Exhibit 1, Schedule B.

8. Plaintiffs' Exhibit 1, Schedule C.

9. Plaintiffs' Exhibit 1, Schedule D.

10. Plaintiffs' Exhibit 1, Schedule E.

11. Plaintiffs' Exhibit 1, Schedule F.

Street Washington DC Stop Have Shipping Space Minimum Five Hundred Tons From New Orleans On Or About August 22 And Balance Will Be Shipped From A Gulf Port Between September 15 and 20 Stop For Your Information It Is Impossible For Anyone Other Than Colorado Fuel & Iron Corporation To Offer Caustic Soda Of U. S. Origin To India At Nine And One Half Cents CIF Bombay As Colorado At Present Have Exclusive Authorized Export License Please Reply Earliest Unquote." [12]

This cablegram was received at the Bombay Branch on August 9th, a Monday, and its contents were communicated to the plaintiffs. On the same day R. S. Dass Badhwar (care Laxmansons) cabled directly to Colorado the following:

"Reference Our Negotiations 2000 Tons Caustic Soda Solid Through National City Bank New York Bombay And Your Acceptance Our Offer At 9.5 Cents Per Lb CIF Indian Port Our Import License Number 000417/48 Valid Up To September 22 Stop Establishing Letter Credit Your Favor Through National City Bank On New York Stop Arrange Shipment Entire Quantity In One Or More Lots To Calcutta Before Above Noted Date Stop Cable Export License Number." [13]

This cablegram was confirmed by R. S. Dass Badhwar by letter dated August 9th. This letter contains the following language:

"* * * * *

"We also understand from our mutual intermediary that you will ship 500 tons by August 22, 1948 from New Orleans-La and the balance from some port in one or more lots as is convenient to you, but you should complete the entire quantity before September 22, 1948 in any case.

"We have had a very sad experience of dealing with another U. S. firm of New York, who offered us June shipment of 800 tons Caustic Soda and believing on their cable we immediately established a letter of credit in their favor but till now, we have no news of the shipment of the goods. We are therefore rather cautious and if it had not been through the National City Bank of New York, Bombay we would have hesitated to deal with a firm whom we do not know. We trust you won't misunderstand our position. We have therefore to request you to fulfill the contract within the stipulated time and in case you fail in your part, you shall be liable to compensate us for the loss of commission and interest.

* * * * *"[14]

A subsequent passage of cables fixed Bombay and not Calcutta as the port of discharge.

On August 12, 1948 Colorado cabled the plaintiffs:

"Hope To Load About 1000 Tons Steamer Jane G. Swisshelm Leaving New Orleans About August 23 Stop Will Cable Exact Amount When Letter Of Credit Definitely Confirmed With Proper Shipping Instructions Cannot Proceed With Shipment Until Documents Properly Prepared In Accordance Stop Now Have Validated Export License For 2000 Tons For Mulkraj Number 1385760." [15]

I find that the agreement between the plaintiffs and Colorado although initially requiring shipment of all of the caustic soda on or before September 22, 1948 [16] was subsequently changed by the parties when the plaintiffs caused two letters of credit to be opened in favor of Colorado and when Colorado accepted payment under the letters of credit. The first letter of credit, which called

12. Plaintiffs' Exhibit 1, Schedule G.

13. Plaintiffs' Exhibit 1, Schedule J.

14. Plaintiffs' Exhibit 1, Schedule K.

15. Plaintiffs' Exhibit 1, Schedule T.

16. Plaintiffs' Exhibit 1, Schedules J and K.

for payment on one part of this shipment of caustic soda, provided that the bills of lading be dated not later than October 10, 1948;[17] the second letter of credit, calling for payment of the remainder of this shipment of caustic soda, provided that the bills of lading be dated not later than September 22, 1948.[18] Thus, plaintiffs by causing one letter of credit to be valid if bills of lading thereunder were dated before October 10, 1948 and Colorado by accepting payment under that letter of credit agreed that shipment of one part of the caustic soda could be made as late as October 10, 1948 (shipment of the other part to be before September 22, 1948).

In sum then, the contract between the plaintiffs and Colorado was for the sale of 2,000 long tons of caustic soda of a specified type, CIF Bombay, India, at a price of 9½ cents per pound, one part to be shipped not later than September 22, 1948, the other part not later than October 10, 1948.

The claim in this suit is only as to some 1,490 tons, the remainder or balance of the contract having been cancelled by the mutual consent of the plaintiffs and defendant Colorado.[19]

The vessel on which the caustic soda was loaded (the S.S. Hawaiian) arrived at Bombay on February 28, 1949, some six months after it had been loaded. To understand plaintiffs' contentions with respect to this delay, it is necessary that we examine somewhat the conditions affecting the maritime industry in 1948, a year of considerable and widespread labor unrest in that industry.

On June 14, 1948 a threatened maritime strike on the East, Gulf and West Coasts was temporarily restrained, and subsequently enjoined for a full eighty-day period expiring September 2, 1948. Orders were made by this Court and the United States District Court for the Northern District of California pursuant to the "national emergency" provisions of the Labor Management Relations Act of 1947.[20] Separate actions were filed on behalf of the United States against various maritime unions and ship operators, including Isbrandtsen and American-Hawaiian.[21] During this period collective bargaining negotiations looking to a settlement of the dispute were in progress. As a result of these negotiations those connected with the maritime industry[22] were optimistic

---

17. Plaintiffs' Exhibit 1, Schedules U and Z.

18. Plaintiffs' Exhibit 1, Schedules AF and AH; see also Plaintiffs' Exhibit 1, Schedule AG.

19. S.M.P. 35–37; Plaintiffs' Exhibit 1. Schedules BE and BF.

20. 29 U.S.C.A. § 141 et seq.

21. Plaintiffs' Exhibits 9 and 10; Civil Action No. 46–299, Southern District of New York.

22. Throughout this opinion reference will be made to the testimony of various witnesses. Listed below are their names and positions:

1. John Hansen Dalton testified that at the time of his examination (October 21, 1952) he was associated with Tidemann & Dalton, Inc., successor to Hansen & Tidemann, Inc.; that in 1948 he was a steamship agent and Vice-President and Secretary of Hansen & Tidemann; that he was associated with Hansen & Tidemann since its formation in 1936; that he had been in the maritime industry since 1931 in the ports of New Orleans, La., and Galveston, Texas, except for the period between 1941 and 1945. Throughout the transactions involved in this suit Hansen & Tidemann acted as the agents of the defendant Isbrandtsen.

2. Frederick R. Becker, Jr. testified that he was secretary-treasurer of Farrell Shipping Company; that he had been associated with that company since 1932, including the year 1948; that the company's business is that of export freight broker and forwarding agents; and that since 1936 Farrell Shipping Company has represented Colorado Fuel and Iron Corp.

3. Robert L. Gray testified that he was Vice-President and Operating Manager of the American-Hawaiian Steamship Company.

4. Frank H. Bain testified that he was Atlantic Marine Superintendent of the American-Hawaiian Steamship Company.

5. Joseph H. Masse testified that he

that the disputes would be satisfactorily settled before the expiration of the eighty-day injunction period.[23] This same optimism was shared by New York and New Orleans freight forwarders who continued to do business as usual and to book freight for July, August and September sailings.[24] It was in such a setting that Colorado, acting through its New Orleans freight forwarder, Farrell Shipping Co., entered into the affreightment contract of July 29, 1948,[25] with the defendant Isbrandtsen for the transportation of 1,000 tons of caustic soda from New Orleans to Bombay, India, on the S.S. Jane G. Swisshelm or other A–1 vessel, the scheduled sailing date of which was August 28–30, 1948, with shipside delivery required between August 19–25, 1948.[26] Conlon, a New York freight forwarder, testified that to arrange for a shipment of cargo of this size required a considerable period of intervening time.[27] Both he and Becker testified that it was very difficult to book freight space for a shipment of caustic soda because of the reluctance of shipping companies to handle a material possessing its physical characteristics.[28] Becker said he met with this difficulty when he unsuccessfully tried to book the cargo with the Isthmian Steamship Company and other lines serving Bombay and that defendant Isbrandtsen was found to be the only carrier willing or able to undertake the shipment.[29]

On August 17, 1948 and pursuant to a right reserved to it under the contract of affreightment [30] defendant Isbrandtsen through its agents, Hansen & Tidemann, notified Farrell Shipping Co., and the latter in turn notified Colorado, that the S.S. Hawaiian which concededly was an A–1 vessel, had been substituted for the S.S. Jane G. Swisshelm, with latest shipside delivery at New Orleans by

was master of the S. S. Hawaiian in August, 1948.

6. Charles A. Kacocha testified that he was master of the S. S. Hawaiian prior to August, 1948 and after the 8th or 9th of December, 1948.

7. Ward Wire testified that he was General Traffic Manager of Colorado.

8. Siguard E. Simpson testified that in September, 1948 he was Chief Clerk of Hansen & Tidemann and personally handled a large number of matters which related to the caustic soda in question.

9. Charles J. Conlon testified that he is a freight forwarder doing business under the name of Shippers Export Service Company in New York City, and that he had been in the freight forwarding business since 1928.

10. Matthew S. Crinkley testified that he was Executive Vice-President of the Isbrandtsen Company, Inc.; that he had been with that organization for the twenty-five years last past; and that the matter in suit came under his overall supervision.

11. Robert T. Smith testified that he was President of the Standard Stevedoring Company; that from January 1, 1947 until September 17, 1951 he was Vice-President and General Manager of the New Orleans Stevedoring Company; and that he had been in the maritime industry thirty-eight years, the last fifteen of which being in New Orleans.

12. Louis B. Morgan testified that he was at the time of his deposition (November 3, 1954) the General Export Sales Manager of Colorado Fuel and Iron Corp., and that in 1948 he was second in command of the export department of that corporation.

23. Testimony of Gray, S.M.P. 410–411; Testimony of Bain, S.M.P. 428.

24. Testimony of Conlon, S.M.P. 127, 145–146, 149, 156; Testimony of Becker, S. M.P. 234–235.

25. Plaintiffs' Exhibit 4 (Dalton deposition), Defendants' Exhibit B; S.M.P. 217.

26. See Defendant Colorado Exhibit A.

27. S.M.P. 143.

28. S.M.P. 140, 146–147, 216; Plaintiffs' Exhibit 4 (Becker deposition), page 176. The difficulty in obtaining a ship to carry caustic soda is that this commodity eats away at its own container and the things around it, if permitted to do so, and it therefore cannot be stored with many other products when shipped. (Plaintiffs' Exhibit 4 (Becker deposition), page 223.)

29. Plaintiffs' Exhibit 4 (Becker deposition), pages 176, 179–180; Defendant Colorado Exhibit A; S.M.P. 235–236.

30. Plaintiffs' Exhibit 4 (Dalton deposition), Defendants' Exhibit B.

September 2, 1948.[31] Upon the receipt of this advice, Colorado requested Farrell Shipping to increase the tonnage covered by the affreightment contract from 1,000 to 1,500 tons and on August 19, 1948 the latter did so by oral arrangement with Hansen & Tidemann, confirming such additional booking to its principal.[32]

Concerning the substitution of the S.S. Hawaiian, Becker testified that while he had been advised by Hansen & Tidemann at the time of the original booking that the S.S. Jane G. Swisshelm was under bareboat charter to Isbrandtsen, he was not advised of the type of charter covering the substituted vessel and made no inquiry of Hansen & Tidemann with respect thereto as it was neither the custom nor the practice in New Orleans to do so.[33] Becker also testified that, prior to September 3, 1948, he did not know that the S.S. Hawaiian was owned by American-Hawaiian or that she was manned by a West Coast crew,[34] and that these were matters of no concern to him for the reason that his business dealings were with Isbrandtsen upon whom he relied and whom he felt to be a reliable company.[35] Ward Wire similarly testified that, prior to September 7, 1948, he knew nothing about the crew or the charter of the Hawaiian.[36]

Having procured a firm commitment for the transportation of 1,500 tons of caustic soda to Bombay, Colorado, between August 20 and 27, 1948, proceeded to ship a total of 1,490 tons by railroad from its plant at Ladora, Colorado, to New Orleans.[37] Meanwhile on August 30, 1948, the S.S. Hawaiian arrived at the Port of New Orleans from Houston, Texas, and, after bunkering, docked at Westwego Wharf No. 3 shortly after 12 noon on August 31, 1948.[38] At 1 p.m. on the same day, loading of the caustic soda aboard the Hawaiian was commenced by stevedores employed by Isbrandtsen, and was continued on September 1 and 2, 1948, on which latter date loading of the caustic soda was completed with the loading of 4,799 drums containing a total of 1491.42 gross tons.[39]

It appears from the Mate's Daily Reports[40] that all of the caustic soda accounted for on the bills of lading was loaded into the Hawaiian prior to the strike. All of the witnesses testified to this effect excepting Captain Kacocha who thought that some of the caustic soda might have been loaded into the upper 'tween deck after the strike was over, but he had no recollection one way or the other.[41] Simpson, an eyewitness, testified that he left Hansen & Tidemann's office for Westwego at 10 a.m. on September 3rd; that it took him about forty-five minutes to get there; that when he arrived he saw no work going on; that he did see trucks on the dock but did not see any caustic soda.[42] I find that all caustic soda was in fact loaded aboard the Hawaiian prior to the strike. The stowage plan[43]

31. Plaintiffs' Exhibit 4 (Becker deposition), page 194; S.M.P. 218.

32. Plaintiffs' Exhibit 4 (Becker deposition), pages 189, 195; S.M.P. 221.

33. S.M.P. 217–219, 280.

34. S.M.P. 224, 257.

35. S.M.P. 252, 257–258.

36. S.M.P. 297.

37. Plaintiffs' Exhibit 4 (Becker deposition), page 186; S.M.P. 293.

38. Plaintiffs' Exhibit 4 (Becker deposition), Defendants' Exhibit J.

39. Plaintiffs' Exhibit 3 (Masse deposition), Plaintiffs' Exhibit 2 (Mate's Daily Reports); Plaintiffs' Exhibit 4 (Dalton deposition), Plaintiffs' Exhibit 2 (Stowage Plan); Plaintiffs' Exhibit 18 (Smooth Deck Log). The stowage plan was prepared after the Hawaiian was loaded. Plaintiffs' Exhibit 4 (Dalton deposition), page 80.

40. Plaintiffs' Exhibit 4 (Dalton deposition), Plaintiffs' Exhibit 1.

41. Plaintiffs' Exhibit 5, pages 8, 28.

42. S.M.P. 388–389.

43. Plaintiffs' Exhibit 4 (Dalton deposition), Plaintiffs' Exhibit 2.

indicates that caustic soda was to be loaded into lower holds 1, 2, 3 and 4 and some into the upper 'tween deck, and that automobiles destined for Basra were to be stowed above the caustic soda. Simpson testified that the caustic soda was placed in the lower holds because it was heavy cargo and because Bombay succeeded Basra on the Hawaiian's list of ports of call.[44] It was therefore planned that the autos would be unloaded at Basra without having to move the caustic soda. It is noted in the smooth deck log [45] that at 6 p. m. on September 2, 1948 "three (3) nite gangs resume loading Nos. 2, 4 and 5 hatches, loading 'Basra' cases, chassis in all lower holds;" that at 10:30 p. m. on the same day No. 2 lower hold (containing caustic soda, with autos on top of the caustic soda) was finished and that the stevedores started loading Basra cargo in No. 2 lower 'tween deck; that all stevedore gangs knocked off for supper at midnight and that at 1 a. m. "four (4) gangs resume loading 'Basra' in Nos. 1, 2, 4, 5 hatches." Simpson corroborated this by testifying that automobiles were being loaded on the night of September 2–3, and that the caustic soda had been loaded into those holds prior to that time.[46] Smith also corroborated this by testifying that all of the caustic soda was aboard the Hawaiian when the strike was called.[47]

The loading certificates of the New York Board of Underwriters state that all of the caustic soda was carried below deck.[48] I find that all of the caustic soda was loaded aboard the Hawaiian by 6 p. m. on September 2, 1948.

The smooth deck log of the Hawaiian [49] shows that at 3 p. m. on September 2 the stewards department left the ship to attend a union meeting and did not return to the ship until 3 a. m. on September 3, when they returned to remove their personal effects. At 3:15 a. m. on September 3, 1948, the stewards of the ship went ashore and were "definitely on strike." [50] The loading of the cargo continued throughout the remainder of that night and until 10 a. m. in the morning.[51] The engine room crew ceased working at that time, struck the vessel and refused to supply the steam necessary to drive the ship's winches so that cargo could be loaded.[52]

Plaintiffs have claimed that the caustic soda was loaded aboard the Hawaiian when it was in an unseaworthy condition: more particularly, that the Hawaiian was unseaworthy as it was without a proper crew. This claim is without foundation. Though the stewards left the ship prior to the completion of loading the caustic soda (by three hours) their services were unnecessary for the loading operation. Even

---

44. S.M.P. 369–370.

45. Plaintiffs' Exhibit 18.

46. S.M.P. 371.

47. Plaintiffs' Exhibit 4 (Smith deposition), page 142.

48. Defendant Isbrandtsen Exhibits 1 and 4.

49. Plaintiffs' Exhibit 18.

50. See supra, Footnote 49.

51. Captain Kococha, who commanded the Hawaiian on the voyage prior to the one in issue and who rejoined the Hawaiian as master in December, 1948, testified that the Pacific Coast labor disturbance gave every indication of being settled, and that strike talk was a frequent conversation piece in the industry, but that on the voyage prior to the one on which the strike occurred neither ship's delegates nor union delegates talked with him with respect to their labor agreements. Plaintiffs' Exhibit 5, pages 5 and 39. Captain Masse, who was master of the Hawaiian during the interval Captain Kacocha was ashore, testified that he had no knowledge of an impending strike and that it "was a surprise to most everybody," and that the first notice he had that any of the crew would walk off the vessel was at 3 a.m. on September 3rd, when the stewards struck. Plaintiffs' Exhibit 4, pages 12, 28–29.

52. The crew of the Hawaiian belonged to West Coast unions so that although agreement had been reached by East and Gulf Coast unions and ship operators it did not affect the crew of the Hawaiian, even though the ship was docked in a Gulf port.

**604**

if it be said that a strike by depriving a vessel of its crew renders the vessel unseaworthy there was no deprivation of crew until 10 a. m. on September 3, some sixteen hours after all of the caustic soda was loaded. And even if it further be said that the deprivation of stewards aboard a merchant vessel renders it without a crew and in turn breaches the warranty of seaworthiness the facts demonstrate that the stewards did not strike until 3:15 on the morning of September 3rd. When the stewards left the Hawaiian on September 2nd it was to attend a union meeting and whether or not they would strike was not known until the following morning after all of the caustic soda had been loaded aboard.

Not knowing or being advised of the work stoppage of the ship's stewards, Farrell Shipping Company at 9:30 a. m. on September 3rd delivered to Hansen & Tidemann Colorado's check in prepayment of the ocean freight charges in the amount of $32,848.72, and a runner for Farrell Shipping received, as had theretofore been requested, the two on board ocean bills of lading covering the shipment, which it thereupon forwarded to Colorado.[53]

Becker testified that he first learned of the strike of the crew of the Hawaiian in the early afternoon of September 3rd but did not inform Colorado of it until September 7th because "the situation was very unclear on September 3rd * * *. It was a temporary situation and we were trying to see how it would progress, and then * * * there was a long weekend occasioned by the Labor Day holiday."[54] Becker also testified that on or about August 18, 1948 he learned that the maritime labor disputes involving the East and Gulf Coasts had been settled and that he had formed the opinion "there would be no trouble at New Orleans, there would be no strike there."[55] He further testified that, prior to the strike, he did not know to what unions the officers and crew of the Hawaiian belonged,[56] that no one told him that a strike was to be declared by the crew aboard the ship,[57] and that Farrell Shipping continued to book space right along for delivery to ships after September 1, 1948.[58] Becker further said that he was dealing with Isbrandtsen and their agents and in August, 1948 did not know who owned the Hawaiian.[59]

Ward Wire testified that the first he heard about a strike involving the Hawaiian was late September 7th or September 8th when he received Becker's telegram advising that the vessel had been "delayed by strike of West Coast crew."[60] Word of the strike came as something of a surprise to Colorado's traffic department. K. B. Griffith, Colorado's Assistant Traffic Manager, wrote to Farrell Shipping Company on September 10th:

" * * * * *

"As a matter of curiosity I am unable to understand why this vessel is being picketed and will appreciate your enlightening me on the subject."[61]

Griffith was advised by Farrell Shipping on September 13th[62] that the strike was due to Isbrandtsen's chartering the Hawaiian from a West Coast line and that the vessel was manned by a crew

53. Testimony of Becker, S.M.P. 223–225, 248–249; Testimony of Simpson, S.M.P. 350–351, 385–386, 391; Plaintiffs' Exhibit 4 (Becker deposition), Defendants' Exhibit I. (That this latter exhibit is dated September 1, 1948 is explained by Becker at pages 211–212 of Plaintiffs' Exhibit 4.)

54. S.M.P. 261–262; Defendant Colorado Exhibit C.

55. S.M.P. 229.

56. S.M.P. 234.

57. S.M.P. 234.

58. S.M.P. 234.

59. S.M.P. 252–253, 257.

60. S.M.P. 295; Defendant Colorado Exhibit C.

61. Defendant Colorado Exhibit B.

62. Defendant Colorado Exhibit D.

belonging to a West Coast union who struck the vessel when a strike of their union commenced on the Pacific Coast. Louis B. Morgan testified that he had no knowledge of the strike aboard the Hawaiian prior to September 13th, and that no information concerning the strike appears in the files prior to that date.[63] Colorado's New York export office by letter of September 20th thereupon notified the plaintiffs of the delay in sailing the Hawaiian.[64] It wasn't until January 8, 1949, after the dispatch of other communications in connection with the caustic soda,[65] that the plaintiffs protested the delay caused by the strike aboard the Hawaiian.[66]

Plaintiffs claim that Colorado failed to notify them promptly of the fact that the Hawaiian was strike-bound. This claim is without substance. In light of the above chronology I find that plaintiffs were notified within a reasonable time after the strike and after the facts of an unclear situation could be had. It should also be noted that only two ships in the entire port of New Orleans were affected by the West Coast strike, the Hawaiian being one of them.

■ Plaintiffs also claim that Colorado breached its duty to them by accepting the substitution of the Hawaiian for the Jane G. Swisshelm, since the expected sailing date of the Hawaiian was after the expiration of the eighty-day Taft-Hartley injunction whereas the sailing date of the Jane G. Swisshelm was before. Little merit lies in this contention since by the very terms of the letters of credit caused to be opened by the plaintiffs they were willing to accept shipment of the caustic soda by September 22nd for one part and October 10th for another.

Once the strike had been called it was not possible either to sail the Hawaiian[67] or to remove the caustic soda and forward it aboard some other vessel. Gray,[68] Crinkley,[69] Becker,[70] Dalton,[71] and Smith[72] all testified that when the engine room gang struck the ship on September 3rd cargo could not be loaded or discharged by ship's tackle because there was no steam to operate the winches and equipment. The Hawaiian was regarded in the trade as a "hot ship."[73] Seamen and stevedores of non-striking unions would not work the vessel because in order to do so they would have had to cross picket lines and this it was well known in the trade they would refuse to do. Similarly for crane operators and others needed to unload the cargo. While the ship was on strike it was impossible to do anything with respect to loading, unloading or sailing her from port.

I hold that due and proper shipment was made when the caustic soda was loaded aboard the Hawaiian.

■ The contract called for the delivery of caustic soda CIF Bombay.[74]

---

63. Plaintiffs' Exhibit 6.

64. Plaintiffs' Exhibit 1, Schedule BC.

65. Plaintiffs' Exhibit 1, Schedules BD, BE, BF and BB.

66. Plaintiffs' Exhibit 1, Schedule BH.

67. Plaintiffs' Exhibit 4 (Smith deposition), pages 121 and 160.

68. S.M.P. 408–409.

69. S.M.P. 328–330.

70. S.M.P. 244.

71. Plaintiffs' Exhibit 4, page 107.

72. Plaintiffs' Exhibit 4, pages 146–148.

73. Plaintiffs' Exhibit 4 (Gormley deposition), page 259.

74. The exchange of cables and correspondence which established the contract evidences a stated intent, if any, that a Gulf port, or more particularly New Orleans would be the point where the "property" in the caustic soda would pass from seller to buyer. New York Personal Property Law, McK.Consol.Laws, c. 41, § 99(1); Cundill v. A. W. Millhauser Corp., 1931, 257 N.Y. 416, 178 N.E. 680; Willits & Patterson v. Abekobei & Co., Limited, 1st Dept.1921, 197 App.Div. 528, 189 N.Y.S. 525; Schopflocher v. Essgee Co. of China, Inc., 1st Dept.1921, 197 App.Div. 781, 189 N.Y.S. 498; cf. Warner, Barnes & Co., Limited, v. Warner Sugar Refining Co., Sup.Ct.1921, 117 Misc. 247, 192 N.Y.S. 151, affirmed sub nom. Warner-Barnes & Co., Ltd., v. Oriente Securities Co., 1st

The caustic soda was fully loaded prior to the commencement of the strike. In sales agreements the risk of loss follows the fictional "property right" to the goods.[75] In a CIF contract the "property" right passes to the buyer upon delivery to the carrier. Hence the "property right to the caustic soda passed to the plaintiffs when the caustic soda was loaded aboard the S.S. Hawaiian, which was prior to the walkout, and the risk of loss also passed to the plaintiffs. (Plaintiffs do not claim that the documents were not actually presented.)

A court naturally hesitates to apply such concepts to a transaction where the parties are unaware of its legal significance. But here this was not the case. Early in the negotiations between the plaintiffs and Colorado there was considerable trading over the price of the caustic soda and shipping arrangements. Colorado offered 4,300 tons at nine cents per pound FAS Gulf Ports or 10.102 cents per pound CIF Bombay. The plaintiffs were willing to pay 9½ cents per pound CIF Bombay. Colorado then wanted ten cents per pound CIF Bombay. The plaintiffs held fast to 9½ cents per pound CIF Bombay and Colorado then met the plaintiffs' price, CIF Bombay. These negotiations point to the fact that the plaintiffs were aware of the import of the terms like FAS and CIF.[76]

The rationale of the rule that under a CIF contract "property" to the goods passes upon delivery to the carrier is that the cost of insurance and freight, in addition to the cost of the goods themselves, is reflected in the contract price. Since then the buyer is really paying the cost of insurance and freight the "property" passes to him. Frequently buyers do not know they are bearing these charges and simply accept the price offered. In such circumstances, the rule would have little support in reason. In the case at bar the plaintiffs realized they were paying for the freight and insurance; without trading, they could have had the caustic soda at nine cents per pound, arranging for paying directly for the freight and insurance themselves. They appear no novices to commercial transactions, and understood the accepted commercial

Dept.1922, 202 App.Div. 789, 194 N.Y.S. 987. That this was a CIF transaction so merges with the conduct of the parties and the usages of the trade, New York Personal Property Law, § 99(2), that it makes it incumbent upon this Court to examine further into this aspect of the contract to better determine the actual intent of the parties. Cf. Dwane v. Weil, 1st Dept.1922, 199 App.Div. 719, 192 N.Y.S. 393, affirmed, 1923, 235 N.Y. 527, 139 N.E. 720.

75. New York Personal Property Law, § 103.

76. Mee v. McNider, 1888, 109 N.Y. 500, 17 N.E. 424; Warner, Barnes & Co., Limited, v. Warner Sugar Refining Co., supra, footnote 74, 117 Misc. 247, 192 N.Y.S. 151; Warner Bros. & Co., Limited, v. Israel, 2 Cir., 1939, 101 F.2d 59; cf. Ledon v. Havemeyer, 1890, 121 N.Y. 179, 24 N.E. 297, 8 L.R.A. 245; see Seaver v. Lindsay Light Co., 1922, 233 N.Y. 273, 276, 135 N.E. 329, 330 where the Court said:
"The meaning of the letters 'c.i.f.' in an executory contract is, and at the time the contract in question was made were, well understood in the commercial world. They mean the cost of the merchandise, insurance thereon, and freight charges to point of destination. Thames & Mersey [Marine] Ins. Co., Ltd., v. United States, 237 U.S. 19, 35 S.Ct. 496, 59 L.Ed. 821. Unless there is something in a c.i.f. contract to indicate to the contrary, the seller completes his contract when he delivers the merchandise called for to the shipper, pays the freight thereon to point of destination, and forwards to the buyer bill of lading, invoice, insurance policy, and receipt showing payment of freight. Mee v. McNider, 109 N.Y. 500, 17 N.E. 424; Smith Co., Ltd., v. Marano, 267 Pa. 107, 110 A. 94, 10 A.L.R. 697; Ireland v. Livingston, L.R. 5 H.L. 395; Klipstein & Co. v. Dilsizian, 2 Cir., 273 F. 473; 2 Williston on Sales, §§ 407, 408; Mechem on Sales, vol. 2, § 1736." See also, Smith Co., Limited v. Moscahlades, 1st Dept. 1920, 193 App.Div. 126, 183 N.Y.S. 500, 503; Madeirense Do Brasil S/A v. Stulman-Emrick Lumber Co., 2d Cir., 1945, 147 F.2d 399, 402, certiorari denied 1945, 325 U.S. 861, 65 S.Ct. 1201, 89 L.Ed. 1982.

meaning of terms like FAS and CIF. They chose to pay the additional ½ cent per pound, *i. e.* 9½ cents per pound flat for everything, goods, freight and insurance. There would be no point to insuring the caustic soda while aboard the vessel unless the plaintiffs had an interest in the caustic soda. Since they were the owners at that time, as between Colorado and themselves, the loss occasioned by the strike should properly be borne by them. I find that the parties to this contract intended that the term CIF be given its normal and accepted commercial effect.[77]

Though our decision could rest there, another important ground is present. With respect to the second ground the issue is: As between the plaintiffs and Colorado under the terms of their contract who should bear the burden of the loss caused by a strike for which, admittedly, neither the plaintiffs nor Colorado was responsible. No undue delay is charged as to Colorado's actions before the walkout nor after its cessation. The only delay of consequence was due to the prolonged strike. I would hold that the seller-shipper is properly relieved of any loss plaintiffs were occasioned by this shipping strike.

Maritime strikes, authorized and unauthorized, occur quite frequently. They vary considerably in duration, from hours to weeks to months as did the strike considered at bar. The certainty of occurrence or duration of a strike is impossible to foretell. Most disputes are resolved without a strike. Most strikes are of brief duration. The results of negotiations cannot be foreseen. Shippers frequently do not know how long a strike is going to last when one is impending or confronting them.[78] If this walkout had lasted a few days or a week there would be no lawsuit here.

The strike might have been settled before the strike deadline; it might have been postponed pending the outcome of further negotiations; when it occurred the force of it might have brought the contesting parties to a speedy resolution of their differences. To say otherwise would mean that shippers when aware that there might be a strike would have to forego all business until the situation became crystal clear. In the face of the many contingencies to hamstring sellers and shippers from proceeding to load and dispatch because of local and national waterfront and shipping labor disturbances would virtually stymie foreign commerce.

At times it can be said that the parties to a contract can allocate the risk of strike as between themselves by making provision therefor in their contract, and in the absence of such a provision the loss better falls upon the shipper-seller as one of the risks incident to his business. This, some contend, is better than to saddle the occasional customer with the loss. Such reasoning is more applicable to strikes affecting the seller's plant or place of business which might be avoided by his own act, *i. e.* acquiescing in the employees' demands. Here, Colorado had no control at all over the striking crewmen. More important, contracting specifically to cover liability due to strike, though to be encouraged, frequently does not enter negotiations which are made with speed and haste, and which involve a speculative element, as did this one.[79] Rather than mechanically apply any fixed rule of law, where the parties themselves have not allocated responsibility, justice is better served by appraising all of the circumstances, the part the various parties played, and thereon determining liability. This may well serve to explain any apparent division of au-

77. For the purposes of clarity, perhaps it should be stated that in the circumstances presented in this case the fictional "property" right in the caustic soda passed at the same time that the parties intended responsibility for the goods to pass from seller to buyer, namely upon the seller's delivery of the caustic soda to the carrier. In effect then, no legal fiction is being applied.

78. See S.M.P. 156, 273.

79. Plaintiffs' Exhibit 2 (Badhwar deposition), page 100.

thority in this area of the law.[80] We do not mean to hold, nor do we, that if, in the face of an impending labor disturbance affecting a shipment under contract, a seller ships having good reason to know that the shipment will not meet the dates contracted for he would be absolved of liability for damages. But here we have no such evidence. Though fraud was pleaded in the complaint, it was not pleaded with the particularity required by the Rules.[81] Ignoring this technical defect, there has been no proof of fraud at all in this case. I hold that Colorado and its agents, Farrell Shipping Company, acted in good faith and under the circumstances exercised reasonable business prudence.

The seller in such a situation is presented with another dilemma. If he fails to load a vessel in the face of an impending strike and the strike never materializes or is quickly terminated he may well be found in litigation defending his judgment against buyers who have suffered damage because of the delay in booking the cargo elsewhere, or defending against carriers for breach of contracts of affreightment and demurrage.[82]

For us to require sellers to know with foresight how long a strike will last and to stop their commercial operations until the shipping picture is completely clear is just too much tightrope walking to require of any one. Where there is a strike, delay caused thereby, and loss caused by the delay, the loss suffered by a party to a commercial contract is better borne by him upon whom it falls, absent, of course, malfeasance by any of the interested parties.

We turn now to the claims against Isbrandtsen and American-Hawaiian. As far as the plaintiffs or Colorado were concerned they were dealing with Isbrandtsen. Isbrandtsen had time chartered the vessel from American-Hawaiian.[83] If liability exists as to the defendant Isbrandtsen, American-Hawaiian might be liable to Isbrandtsen, which would, of course, be determined by the terms of the charter party. We will first deal with the actions of Isbrandtsen and their agents making reference to American-Hawaiian where necessary, and then to the liability of American-Hawaiian, if any exists.

■ I find no liability on the part of Isbrandtsen for any losses which may have been sustained by the plaintiffs. Isbrandtsen was bound to deliver the bills of lading to the shipper, upon his demand, after receiving the caustic soda into its charge, i. e., as soon as this cargo was loaded aboard the S.S. Hawaiian. Becker testified that he asked for the bills of lading[84] and his testimony is corroborated by Simpson who said that some one in the office of Farrell Shipping 'phoned on September 2nd to determine when they could be expected to pick up the bills of lading.[85] Both witnesses testified that this was the normal practice in the industry.[86] I have found that all of the caustic soda was loaded aboard the Hawaiian by 6 p. m. on September 2nd, 1948, 15½ hours before Simpson delivered the bills of lading to a runner from Farrell Shipping.[87] Therefore Isbrandtsen through its agents Hansen & Tidemann made proper delivery of the bills of lading to Farrell Shipping Company, as it was required by law to do.[88]

80. See 6 Williston on Contracts 1951A (1938).

81. Fed.R.Civ.P. 9(b).

82. See S.M.P. 274.

83. Plaintiffs' Exhibit 3 (Masse deposition), Defendant American-Hawaiian Exhibit 1.

84. S.M.P. 248.

85. S.M.P. 351.

86. S.M.P. 248, 351.

87. S.M.P. 350–351.

88. United States Carriage of Goods by Sea Act, § 3(3), 46 U.S.C.A. § 1303(3). This section provides:

"(3) After receiving the goods into his charge the carrier, or the master or agent of the carrier, shall, on demand of the shipper, issue to the shipper a bill of lading * * *."

In addition, under the terms of the United States Carriage of Goods by Sea Act the carrier is expressly exempted from responsibility for loss or damage arising or resulting from "strikes or lockouts or stoppage or restraint of labor from whatever cause, whether partial or general: * * *."[89] The United State Carriage of Goods by Sea Act was expressly incorporated into the bills of lading in paragraph 1 thereof.[90]

It is appropriate at this point to consider plaintiffs' claim that defendants were in an unholy hurry to load their caustic soda aboard the Hawaiian. With this contention plaintiffs seek to persuade the Court that Colorado was remiss in its duties (whether they sound in tort or contract is not here important) seeking to load only so it could get the bills of lading and be able to collect under the letters of credit, and that Isbrandtsen was negligent, if not reckless, seeking to load only so it could collect the freight charges, and that thus Isbrandtsen is deprived of the exoneration provided by the United States Carriage of Goods by Sea Act, § 4(2) (j)[91] and is otherwise liable. As to Colorado there is no evidence that its agent, Farrell Shipping Company, had anything to do with the loading of the Hawaiian. That was Isbrandtsen's job, and we will deal with this phase of the case only in terms of the actions of Isbrandtsen and their agents.

The principal evidence upon which the plaintiffs rely to support their contention surrounds the fact that the stevedores in loading the Hawaiian at New Orleans worked overtime.[92] Matthew Crinkley testified that Isbrandtsen hired the stevedores (New Orleans Stevedoring Company, Inc.) by contract and arranged for their services, but that it was the duty of Hansen & Tidemann to give the necessary cooperation and supervision to the stevedoring that was

89. § 4(2) (j), 46 U.S.C.A. § 1304(2) (j). This section provides in full:
"(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—
* * * * * *
"(j) Strikes or lockouts or stoppage or restraint of labor from whatever cause, whether partial or general: *Provided,* That nothing herein contained shall be construed to relieve a carrier from responsibility for the carrier's own acts".

90. Plaintiffs' Exhibit 4 (Dalton deposition), Defendants' Exhibits F and H.

91. 46 U.S.C.A. § 1304(2) (j). The proviso in this section (see footnote 89, supra) must refer to acts of the carrier for which in law the carrier can be attributed with some measure of fault. If any act of the carrier deprived it of the protection of the statute the section would be without meaning.

92. The Hawaiian arrived in New Orleans at 11:06 a.m. on August 30, 1948. Shortly thereafter the bar pilot boarded the vessel. At 1:34 p.m. the river pilot boarded and directed the ship up the Mississippi River. At 8:17 p.m. the Hawaiian docked at the Standard Oil Chalmette dock and proceeded to bunker at 10:35 p. m. After bunkering the Hawaiian went to Westwego Wharf No. 3 arriving around noon on the 31st of August. At 1 p.m. loading of the vessel commenced. On Friday, September 3rd, at ten in the morning loading ceased because of the strike, and the vessel was declared off hire, whereupon it was released to the Strachan Shipping Company on orders of the American-Hawaiian Steamship Company. It returned to the Westwego Wharf at 8:30 p.m. on December 9, 1948, and loading was resumed at 8 a.m. on December 13th when the Hawaiian got its steam up. (Plaintiffs' Exhibit 18; Plaintiffs' Exhibit 4 (Smith deposition), page 159.) The plaintiffs do not claim deviation nor do they claim that once the vessel left New Orleans after the strike had ended it did not prosecute that voyage promptly and diligently. (S.M.P. 181–184.) The vessel arrived in Bombay on February 25th, 1949, and commenced discharging cargo when it got into a wharf on February 28, 1949. Some delay in getting into the wharf was experienced due to the congestion of the harbor. (Plaintiffs' Exhibit 5 (Kacocha deposition), pages 18–19.) All the cargo consigned to the plaintiffs was discharged by the Hawaiian into the custody of the Bombay Port Trust on or before March 12, 1949. (Plaintiffs' Exhibit 5 (Kacocha deposition), page 20.) All the cargo composing this shipment was received by the plaintiffs from the Bombay Port Trust on or before March 17, 1949. (Plaintiffs' Exhibit 2 (Badhwar deposition), Defendant Isbrandtsen Exhibit C.)

done on Isbrandtsen's behalf.[93] The record is not entirely clear as to who ordered the overtime here considered, but it was either Isbrandtsen or their agents, Hansen & Tidemann.[94] In the course of loading the Hawaiian the stevedores worked some 18 hours overtime, of which only three hours were worked during the period the caustic soda was being loaded.[95] According to Dalton's testimony overtime was worked by the stevedores on the Hawaiian during the following hours: (A) Wednesday, September 1, 1948—from 5 p. m. until 6 p. m. (B) Thursday, September 2, 1948—from 7 a. m. until 8 a. m.; from 5 p. m. until 6 p. m.; and from either 6 p. m. or 7 p. m.[96] until midnight. (C) Friday, September 3, 1948—from 1 a. m. until 10 a. m.

■ Plaintiffs further point to a letter dated September 2, 1948 from Robert T. Smith, Vice-President and General Manager of the New Orleans Stevedoring Company to Dalton.[97] This letter is set out in full:

"Re:  S.S. 'Hawaiian'

"Dear Mr. Dalton:

"This will confirm our telephone conversation of yesterday wherein we advised you that there is a possibility of being able to sail this vessel from New Orleans Saturday afternoon, weather permitting, at an overtime cost of approximately $1000.00 to $1500.00.

"In giving you this estimate please bear in mind the difficulty we are encountering in loading the vessel. Due to her construction the parcels of boxed automobiles and the hogsheads of tobacco are confronting us with a serious stowage problem and we could possibly encounter unexpected delays in stowing the large boxes of automobiles and trucks and the progress we will make when we start loading them cannot be determined at this time.

"We are now chiefly concerned with getting all the cargo on board and in order to do so we cannot concern ourselves too much with despatch even though it could possibly mean a financial loss to ourselves as we understand the gravity of the situation should any cargo be shut out."

Taking this document at its face, it seems that Dalton and Smith had a telephone conversation on September 1st with respect to what it would cost to work the Hawaiian overtime. Smith advised Dalton of the cost and confirmed his advices on the day following with this letter. The major part of the overtime worked was from six p.m. on September 2nd until the crew of the Hawaiian refused to supply steam at 10 a. m. on the morning of September 3rd.[98] At 1:07 p.m. on September 2nd, a telegram addressed to Hansen & Tidemann for Captain Masse was received in the New Orleans office of Western Union.[99] This telegram was delivered to Hansen & Tidemann and in the regular course of business copies were typed and the original telegram and either two or three copies were given to Captain Masse.[100]

93. S.M.P. 327–328.

94. See Plaintiffs' Exhibit 4 (Dalton deposition), pages 30–31.

95. Plaintiffs' Exhibit 4 (Dalton deposition), page 32.

96. According to the Hawaiian's smooth deck log (Plaintiffs' Exhibit 18) for September 2, 1948, the four-day gangs of stevedores knocked off for supper at 6 p. m. and at the same hour three night gangs commenced loading. Overtime was therefore worked on that date from 6 p.m., and not 7 p.m., until midnight.

97. Plaintiffs' Exhibit 4 (Dalton deposition), Plaintiffs' Exhibit 3.

98. It was Smith's testimony that his letter of September 2nd was written in good faith and expressed his honest view in voicing the hope that the Hawaiian could leave New Orleans on September 3rd, and that overtime is a quite normal occurrence in the shipping industry. (Plaintiffs' Exhibit 4 (Smith deposition), page 158.)

99. Plaintiffs' Exhibit 4 (Dalton deposition), Plaintiffs' Exhibit 4.

100. Plaintiffs' Exhibit 4 (Dalton deposition), page 50.

It was never elicited from Dalton whether or not he had any personal knowledge of that telegram. In any event some one or more of his employees had knowledge of it, and that knowledge is chargeable to him.[101] Taking these facts from the vantage point most favorable to the plaintiffs we have this picture: Hansen & Tidemann, fully conscious that the 80-day injunction period was ending on September 2, 1948 were exceedingly anxious to have the Hawaiian loaded as quickly as possible. They had knowledge sometime in the afternoon of the 2nd that a strike was imminent if only by virtue of Gray's telegram to Masse instructing Masse as to the procedure to follow if a strike was not averted.[102] In an effort to get the ship to sea before a strike was called they ordered the Hawaiian to be worked through the night of September 2nd in order to beat the strike deadline.[103] The question thus presented with the evidence so viewed is whether this was the exercise of due diligence and sound business judgment or whether it was negligence or recklessness so as to remove from the carrier the cloak of immunity with which 4 (2) (j) of the United States Carriage of Goods by Sea Act enshrouds it. I hold that even if the evidence were so viewed loading the Hawaiian in the manner in which it was loaded was not reckless or negligent conduct. As with the shipper it is too much to require of the carrier that it wait until a strike situation becomes crystal clear before loading a vessel. Customers want their goods. Hindsight now reveals to us that this strike lasted quite a long time,[104] and it was, furthermore, a reasonable estimate of the situation to believe that the vessel could be loaded before the crew stopped supplying the steam.[105] (Two observations should be noted: (1) Plaintiffs would have us believe that all Hansen & Tidemann sought to accomplish was to have the caustic soda loaded before the expiration of the injunction period, thereby enabling themselves to collect the freight charges and enabling Colorado to collect under the bills of lading in the event a strike did occur. Plaintiffs have not introduced any proof whatsoever of such devious conduct, or that any anxiety on the part of Hansen & Tidemann to load the vessel was solely for the purpose of collecting with respect to the caustic soda. Most favorably viewed, the proof points only to an anxiety to load all of the New Orleans cargo aboard the Hawaiian and get it out of port as quickly as possible or to go to sea before a strike leaving some cargo destined for the Hawaiian on the wharf.[106] (2) The other observation is that although the injunction ended September 2nd, on September 1st Dalton and Smith were talking in terms of get-

101. Simpson testified that he arrived at the office of Hansen & Tidemann at 8 a.m. on September 3rd, issued the bills of lading at 9:30 a.m., and saw Gray's telegram to Masse. The question was never put to him as to whether he saw the telegram prior to or after delivering the bills of lading to Farrell Shipping's runner.

102. It was Gray's testimony that up to the time of the strike he and American-Hawaiian were hopeful that a strike could be averted; that during the period the injunction was in force American-Hawaiian operated on the theory that there would be no strike; that on September 2nd the unions and ship operators had a meeting to resolve their differences; that at that time there was agreement on some things; that negotiations had been going on for some time and continued after the strike was declared; that a Mr. Plant, Vice-President of operations of American-Hawaiian, told him on September 2nd that the labor situation didn't look too good; and that the telegram was sent to Captain Masse in the event a strike did occur, but that he had no actual knowledge that there would be a strike. (S.M.P. 415 et seq.)

103. See Plaintiffs' Exhibit 4 (Smith deposition), page 154.

104. Plaintiffs' Exhibit 4 (Smith deposition), page 155.

105. See Plaintiffs' Exhibit 4 (Smith deposition), page 170.

106. Captain Masse testified that the Hawaiian was about two-thirds loaded when the engine room gang struck. Plaintiffs' Exhibit 3, page 13.

ting the Hawaiian to sail by Saturday, September 3rd. This would indicate that overtime was being considered and was finally utilized for reasons other than beating the strike deadline, e. g. to save on the ship's operating expenses.[107]

However, with the evidence in its proper posture, Hansen & Tidemann on the afternoon of September 2nd are confronted by a dilemma. The Hawaiian is in the process of being loaded. The stewards have gone off to a union meeting; the Taft-Hartley injunction ends at midnight and the West Coast unions and ship operators have not yet reached agreement; Gray's telegram to Masse is received instructing him on what to do if a strike occurs; the vessel is about one-third loaded. Things don't look any too good. Should loading be stopped (and perhaps unloading commence) or should the Hawaiian be worked around the clock in an endeavor to beat the actual strike? If the loading is stopped the caustic soda will be aboard when the strike is declared, if one is declared. It may be of short or long duration, but during that period it will be impossible to remove the caustic soda. The consignee may or may not get his cargo when he needs it. If the decision is to start unloading there will be considerable difficulty booking the caustic soda on another ship. It is a touchy commodity, and another ship may or may not be had in time. If the loading is rushed the Hawaiian may be able to get to sea before the strike, if there is one. The ship should be completely loaded some time during the night of September 3rd–4th. The stewards haven't really struck; they're just talking about it in the union hall. If the caustic soda is to stay aboard because of difficulty in getting another ship it might be worth the effort to try to get the Hawaiian to sea. The East and Gulf Coast unions and ship operators have agreed to terms and maybe the West Coast unions and operators will do likewise within a short time. The unions may not strike even after the expiration of the injunction be-

cause agreement may be near, and if they do strike it may not be for a long time. What as a reasonable businessman showing proper regard for the rights of consignees should be done? There is not much time, quick thinking is called for, and a decision must be reached. This Court cannot say that to continue with the loading as fast as possible in an attempt to get the Hawaiian to sea before a strike demonstrates the absence of due care. Hindsight provides a better view than foresight. But as the facts were, to proceed with loading with all possible dispatch was a reasonable decision.

This view of the situation applies all the more to the actions of Captain Masse, master of the Hawaiian, when hours later he was confronted with the strike of the stewards at 3:15 a.m. on September 3rd. His decision not to stop the charterer from loading was proper under the circumstances.

For the law to demand that a carrier halt operations to await the outcome of imponderables, or to prescribe that only regular time be worked when a strike is threatened is to substitute a judge's business judgment for that of a businessman expert in the industry. The ordering of overtime was done in good faith, to get the Hawaiian loaded and to sea before any walkout occurred. The decision was a reasonable one under the circumstances and might have succeeded. A day or two before the crew struck it was reasonable to believe that the Hawaiian would either be able to get to sea before the crew struck or that if a strike was not averted before the vessel was fully loaded the strike would not be of the very long duration we now know it was. That this view of the matter did not prove to be successful makes it no more imprudent seven years after the event than it was at the time, and certainly does not turn that conduct into a legal claim. And where only three hours of overtime were spent in the load-

107. See Plaintiffs' Exhibit 4 (Dalton deposition), page 105; Plaintiffs' Exhibit 5 (Kacocha deposition), page 57.

ing of plaintiffs' cargo, the force of their contention loses much of its vitality.[108]

■ Neither do we think that Isbrandtsen or its agents Hansen & Tidemann were remiss in their legal obligations in delivering the bills of lading for the caustic soda to Farrell Shipping Company after the Hawaiian's stewards went on strike. Simpson gave the bills of lading to Farrell Shipping's runner at 9:30 a.m. on September 3rd, the engine room crew stopped supplying steam at 10 a.m. thereby preventing any further loading, but the ship's stewards department were ashore "and definitely on strike" at 3:15 a.m.[109] Neither Becker nor Simpson knew anything of the strike aboard the Hawaiian until the crew stopped providing steam. Was Hansen & Tidemann required to withhold issuing the bills of lading once there was any sort of strike aboard the Hawaiian, whether they actually knew of it or not? We think not. The carrier was required to issue the onboard bills of lading once the caustic soda had been stowed in its holds. The only option it enjoyed in the face of the impending strike was to refuse to load at all. Once it did load it was required to issue the bills of lading.[110]

As to American-Hawaiian it had no knowledge of the sale of the caustic soda nor any interest in the letters of credit or the proceeds thereof. It had no knowledge or interest in the negotiations between the shipper and Isbrandtsen nor in the arrangements between the two for the transportation of the goods. The booking agreement and delivery orders were signed by agents for the charterer, and Farrell Shipping, the forwarder and agent for Colorado. The bills of lading according to the testimony were prepared by Farrell Shipping Company and were signed by Isbrandtsen's agent. The goods were placed in the vessel's holds by the charterer's stevedores. Whether or not to declare the ship off hire was at the option of the charterer. Until that option was exercised, strike or no strike, the owner was subject to the order of the charterer with respect to the receipt and transportation of cargo.

■ All that connects American-Hawaiian directly with the plaintiffs is the charter party, i. e. the contract of carriage. Plaintiffs claim that American-Hawaiian was negligent in not refusing to accept the cargo tendered and loaded aboard the Hawaiian. To have refused the cargo is all that could have been done by American-Hawaiian. Actions must be judged at the time and in the circumstances of late August and early September, 1948. No one knew what the eventual outcome of the negotiations would be. If American-Hawaiian had refused to accept the cargo and the strike had not occurred or lasted only a short time, this Court might well be determining a case of breach of contract brought by the shipper and charterer against American-Hawaiian for refusal to accept the cargo. Masse's decision to take cargo aboard even after the stewards struck was reasonable, as was the decision to accept the cargo in the first place.

The collective bargaining that was being had was between all West Coast ship operators on the one hand and all West Coast unions on the other. American-Hawaiian might have capitulated on its own and the unions might have worked American-Hawaiian vessels alone among West Coast operators. However, the industry is not run that way. The strength the unions have by their number is balanced by the strength the operators have in bargaining as a unit. It is not for this Court to condemn this practice and saddle upon American-Hawaiian any loss plaintiffs might have

---

108. See The Maui, 9 Cir., 1940, 113 F.2d 1018, 1940 A.M.C. 1299, certiorari denied John Demartini Co. v. The Maui, 1940, 311 U.S. 709, 61 S.Ct. 317, 85 L.Ed. 461; The Toronto, 2 Cir., 1909, 174 F. 632; 4 Williston on Contracts 1095 (1936).

109. Plaintiffs' Exhibit 18.

110. United States Carriage of Goods by Sea Act, § 3(3), 46 U.S.C.A. § 1303(3).

sustained because they did not on their own come to terms with the unions.

In the event liability were found as to either Isbrandtsen or American-Hawaiian the charter party would control the manner of distributing that liability as between them. Since no liability is present we need not investigate the relationships created by the charter party.

█ Although in this opinion we have dealt with the merits of all of the plaintiffs' contentions we deem it advisable to pass upon the various defenses of the defendants relating to statutes of limitation. In our view of the matter plaintiffs' claims against the carriers are grounded in the federal law affecting water carriers in foreign commerce, thereby making applicable the United States Carriage of Goods by Sea Act.[111] Once the stevedores hired by Isbrandtsen started loading the caustic soda into the holds of the Hawaiian the goods were no longer merely "awaiting shipment"[112] and the caustic soda was then in the custody of the carrier. Plaintiffs' claims against Isbrandtsen and American-Hawaiian largely relate to this period. The one-year limitation on the bringing of actions contained in the United States Carriage of Goods by Sea Act is applicable to these claims.[113] Because we believe this to be a federal matter, under the Supremacy Clause,[114] it is essentially unnecessary for this Court to determine the applicability and effect of state statutes of limitation or prescription, and for the same reason Guaranty Trust Co. of New York v. York[115] would appear to have no application to this case.[116]

The language of § 3(6),[117] the limitations provision, that the carrier be discharged from liability "in respect of loss or damage" is broad enough to encompass plaintiffs' claims of negligent delay, negligence in doing any loading at all, fraud and conversion (if they had been proved). The Supreme Court had occasion to pass upon a similar problem of construction in New York, P. & N. R. Co. v. Peninsula Produce Exch. of Maryland,[118] and said:

"The words 'any loss, damage, or injury to such property,' caused by the initial carrier or by any connecting carrier, are comprehensive enough to embrace all damages resulting from any failure to discharge a carrier's duty with respect to any part of the transportation to the agreed destination."[119]

█ All of the caustic soda was delivered into the custody of the Bombay Port Trust by March 12, 1949.[120] All of the caustic soda was received by the plaintiffs from the Bombay Port Trust by March 17, 1949.[121] No written notice

---

111. Mackay v. United States, 2 Cir., 1952, 197 F.2d 241, affirming D.C.S.D.N.Y.1948, 83 F.Supp. 14. See the United States Carriage of Goods by Sea Act, §§ 2, 3(2), 46 U.S.C.A. §§ 1302, 1303(2).

112. Plaintiffs' Exhibit 4 (Dalton deposition), Defendants' Exhibit B, Paragraph 6.

113. United States Carriage of Goods by Sea Act, § 3(6), 46 U.S.C.A. § 1303(6).

114. U.S.Const. art. VI.

115. 1945, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079.

116. "We put to one side the considerations relevant in disposing of questions that arise when a federal court is adjudicating a claim based on a federal law. [Citing cases.] Our problem touches transactions for which rights and obligations are created by one of the States, and for the assertion of which, in case of diversity of the citizenship of the parties, Congress has made a federal court another available forum." Guaranty Trust Co. of New York v. York, 1945, 326 U.S. 99, 101, 65 S.Ct. 1464, 1466, 89 L.Ed. 2079.

117. "In any event the carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered: * * *."

118. 1915, 240 U.S. 34, 36 S.Ct. 230, 60 L.Ed. 511.

119. At page 38 of 240 U.S. at page 232 of 36 S.Ct.

120. Plaintiffs' Exhibit 5 (Kacocha deposition), page 20.

121. Plaintiffs' Exhibit 2 (Badhwar deposition), Defendant Isbrandtsen Exhibit C.

of any loss or damage was given to Isbrandtsen or their agents within the time specified in the United States Carriage of Goods by Sea Act, § 3(6).[122] The complaint in this suit was not filed until October 27, 1950. More than nineteen months elapsed between the time of delivery to the plaintiffs and the bringing of the action. The one-year limitation of actions contained in the United State Carriage of Goods by Sea Act, § 3(6) bars the plaintiffs from whatever remedy they might have been entitled to with respect to their claims against the carriers.

If, however, it be thought that plaintiffs' claims against the carriers and the rights they contend have been violated are state created, then we feel that whatever plaintiffs' rights may have been with respect to any alleged negligence, fraud or conversion by either Colorado or the carriers they have been extinguished. Which brings us to the question of what is the applicable law. This Court in determining state created rights must apply the rules of conflict of laws that the Courts of the State of New York would apply.[123] Under its conflict of laws principles the substantive law that the New York courts would look to on the negligence, fraud and conversion claims would appear to be the *lex loci delicti*.[124] In the case before us that would be the law of the State of Louisiana. Were we free to determine this of our own choice the result would be the same, as Louisiana was the state in which the acts complained of principally occurred. It was the focus of activities and the place of paramount contacts.[125] Viewing this another way, since we as a federal court are dealing with statutes of limitation and of prescription concerning state created substantive rights we are required to apply the law that would be applied as if this suit were brought in a court of the State of New York and in a manner so as not to affect the outcome of the litigation simply because the parties are in a federal forum.[126] By the application of § 13 of the New York Civil Practice Act[127] we are referred to the statutes of limitation and of prescription of the State of Louisiana. Louisiana follows the civil rather than the common law, and according to its law statutes of prescription extinguish the right rather than in the ordinary case at common law bar the remedy.[128] However, in terms of the meaning to litigants the effect is the same. Article 3536 of the Louisiana Statutes Annotated—Civil Code provides that actions "resulting from offenses or quasi offenses" are prescribed within one year.[129] What are regarded

122. 46 U.S.C.A. § 1303(6).

123. Klaxon Co. v. Stentor Electric Mfg. Co., Inc., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477.

124. Poplar v. Bourjois, 1948, 298 N.Y. 62, 80 N.E.2d 334; Coster v. Coster, 1943, 289 N.Y. 438, 46 N.E.2d 509, 146 A.L.R. 702; Cherwien v. Geiter, 1936, 272 N.Y. 165, 5 N.E.2d 185.

125. See Cheatham, Goodrich, Griswold and Reese, Cases and Materials on Conflict of Laws 420 et seq. (3rd ed. 1951).

126. Guaranty Trust Co. of New York v. York, 1945, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079.

127. "§ 13. Limitation where cause of action arises outside of the state. Where a cause of action arises outside of this state, an action cannot be brought in a court of this state to enforce such cause of action after the expiration of the time limited by the laws either of this state or of the state or country where the cause of action arose, for bringing an action upon the cause of action, except that where the cause of action originally accrued in favor of a resident of this state, the time limited by the laws of this state shall apply. * * * "
Plaintiffs herein are not residents of the State of New York.

128. Compare De Bouchel v. Koss Const. Co., Inc., 1934, 180 La. 615, 157 So. 270 with Wood & Sclick v. Compagnie Generale Transatlantique, 2 Cir., 1930, 43 F.2d 941.

129. "Art. 3536. The following actions are also prescribed by one year:
"That for injurious words, whether verbal or written, and that for damages caused by animals, or resulting from offenses or quasi offenses."

# 616

in the State of Louisiana as offenses and quasi offenses are what the common law denominates as torts. The Supreme Court of Louisiana has held that this one year period of prescription applies to actions in negligence,[130] to actions in fraud,[131] and we take the opinion and judgment of the Court of Appeals for the Fifth Circuit in Colley v. Canal Bank & Trust Co.[132] as expositive of the law of Louisiana that Article 3536 applies to actions for conversion.

Plaintiffs urge that Article 13 of the Louisiana Code of Practice treats statutes of limitation and of prescription as procedural and to be governed by the *lex fori*,[133] and therefore even if New York Civil Practice Act, § 13 refers over to the Louisiana prescriptive statute, Louisiana refers the matter back to New York creating in effect a renvoi situation. Whether the New York rule of conflict of laws is that New York courts are required to look only to the substantive law of the *lex loci delicti* or whether it is that New York courts must look to both the substantive and conflicts law of the *lex loci delicti* need not concern us in the light of the language of § 13 of the New York Civil Practice Act and the construction the New York courts have

given it.[134] The policy motivating this section is to preclude persons from coming into New York courts to sue on a foreign cause of action which would be barred in the foreign jurisdiction, i. e. permitting a suit to proceed in New York when it would be barred if brought in the appropriate forum.[135] New York would therefore apply the Louisiana statutes of prescription without regard to Article 13 of the Louisiana Code of Practice.[136]

Little need be said of the plaintiffs' claim of damage to some 60,000 pounds of caustic soda. There is no evidence indicating that there was any physical damage to the 526 drums when they were delivered into the custody of Isbrandtsen. In fact, the two on board bills of lading issued by Isbrandtsen covering the entire 4799 drums shipped noted no exceptions and acknowledged receipt of the goods "in apparent good order and condition." [137] In other words they were clean bills of lading and as such constituted *prima facie* proof that the drums were in good order and condition at that time.[138] Thus plaintiffs' claim must be limited solely as one for cargo damage and is clearly time barred.[139]

130. Sims v. New Orleans Ry. & Light Co., 1914, 134 La. 897, 64 So. 823.

131. Thomas v. Whittington, 127 La. 551, 53 So. 860.

132. 5 Cir., 1947, 159 F.2d 153.

133. "The forms, the effects, and the prescription of actions, are governed by the law of the place where they are brought; but contracts are governed by the law of the place where they were entered into."

134. To create a renvoi situation here requires more than this. It is necessary to say that the New York conflicts rule is that it will look to the state of the *lex loci delicti* and examine its substantive law, its law with respect to conflict of laws and its law with respect to statutes of limitation. Absent a specific statutory mandate New York adheres to the distinction between substantive and procedural matters and in general considers statutes of limitation procedural and going to the remedy, therefore to be governed by the law of the forum. However in this case we have an explicit provision, § 13 of the New York Civil Practice Act, to construe. Such a borrowing statute is in reality a legislative determination of the rule of conflict of laws to be applied when a question arises as to the applicable statute of limitation.

135. See National Surety Co. v. Ruffin, 1926, 242 N.Y. 413, 417, 152 N.E. 246, 247.

136. The question of the relationship of statutes of limitation and applicable law in admiralty causes was recently extensively analyzed and considered in Bournias v. Atlantic Maritime Co., Ltd., 2 Cir., 1955, 220 F.2d 152.

137. Plaintiffs' Exhibit 1, Schedules AO and AS.

138. See, Minneapolis F. & M. Ins. Co. v. Baltimore & O. R. Co., 1954, 237 Minn. 111, 53 N.W.2d 828, 33 A.L.R.2d 860, for a collection of cases.

139. United States Carriage of Goods by Sea Act, § 3(6), 46 U.S.C.A. § 1303(6).

The complaint is dismissed without costs. Since there is no liability on the part of Isbrandtsen to the plaintiffs, the cross-claim of American-Hawaiian against Isbrandtsen is similarly dismissed.

Submit judgment.