**R. S. Dass BADHWAR** and **R. B. Lachhmandass Mohanlal & Sons, Ltd.**, a copartnership d.b.a. **Mulkraj Brothers and Badhwar**, Plaintiffs,

v.

The **COLORADO FUEL AND IRON CORPORATION**, Isbrandtsen Company, Inc., and American-Hawaiian Steamship Company, Defendants.

No. 328, Docket 24016.

United States Court of Appeals
Second Circuit.

Argued April 5, 1957.

Decided May 29, 1957.

James F. Dunn, of Dunn & Zuckerman, New York City, for plaintiffs.

Francis S. Bensel, of Kelley, Drye, Newhall & Maginnes, New York City (W. Frederick Knecht, of Kelley, Drye, Newhall & Maginnes, New York City, on the brief), for defendant Colorado Fuel and Iron Corporation.

Woodson D. Scott, of Lord, Day & Lord, New York City, for defendant Isbrandtsen Company, Inc.

Edward J. Heine, Jr. (L. DeGrove Potter, of Kirlin, Campbell & Keating, New York City, on the brief), for defendant American-Hawaiian Steamship Company.

Before CLARK, Chief Judge, and HAND and LUMBARD, Circuit Judges.

CLARK, Chief Judge.

■ This appeal presents interesting issues concerning the duty of an American seller under a C.I.F. contract to select a suitable ship to carry goods to a foreign buyer on the eve of an impending strike. The facts are fully stated in the reasoned opinion of the district court, D.C.S.D.N.Y., 138 F.Supp. 595; and so we shall limit ourselves to a summary statement. In early August 1948 The Colorado Fuel and Iron Corporation agreed to sell the plaintiffs 2,000 tons of caustic soda C.I.F. Bombay. Part of this merchandise was to be shipped from a Gulf port by September 22, 1948, the last day on which one of the buyer's import licenses was valid. The 1,490 tons in controversy were loaded aboard the S.S. Hawaiian in New Orleans by September 2, and the documents of title were delivered to the buyer's New York bank on September 7. But on September 3 the ship's crew went on strike, and the vessel did not leave New Orleans until some three months later. The Indian buyers brought this action, based on the diverse citizenship of the parties, against the shipper, the carrier, and the vessel owner to recover damages for loss of market caused by the late delivery; and the chief question on appeal is whether Colorado breached its contract. The district court found no breach. We agree with its conclusion and accept its findings of fact.

The United States District Court for the Northern District of California on June 14, 1948, temporarily restrained, and later enjoined, a threatened maritime strike of the East, Gulf, and West Coasts, under the national emergency provisions of the Labor Management Relations Act of 1947, 29 U.S.C. § 141 et seq. The injunction was to expire at midnight September 2 at the end of an 80-day cooling-off period. During the summer, settlement negotiations were conducted; and the maritime industry was sufficiently optimistic as to the prospects of settlement that New York and New Orleans freight forwarders contin-

ued to book freight for September sailings. Colorado's New Orleans freight forwarder entered into an affreightment contract with Isbrandtsen Company, Inc., July 29, 1948, whereby Isbrandtsen was to transport 1,000 tons of caustic soda from New Orleans to Bombay on the S.S. Jane G. Swisshelm or other A–1 vessel, the scheduled sailing date being August 28–30, 1948. Shipping companies were reluctant to handle caustic soda, and Isbrandtsen was the only carrier found by the freight forwarder willing or able to undertake shipment.

Under the contract of affreightment shipside delivery was required between August 19 and 25. On August 17, Isbrandtsen exercised its right to substitute the S.S. Hawaiian, an A–1 vessel, for the S.S. Jane G. Swisshelm, with latest shipside delivery September 2, 1948. Upon receipt of this advice Colorado had the tonnage covered by the contract increased from 1,000 to 1,500 tons. Becker, secretary-treasurer of the New Orleans freight forwarder, testified that on or about August 18 he learned that the Gulf and East Coast disputes had been settled; and he had formed the opinion that there would be no strike at New Orleans. He did not know that the substituted vessel had a West Coast crew, since he was not advised by the carrier's agent and made no inquiry of his own; it was not the custom or practice of the port to do so. Becker testified further that he dealt with Isbrandtsen, which he considered reliable, and not with the persons from whom Isbrandtsen chartered ships. Consequently he did not know whether the S.S. Hawaiian was under time or bareboat charter or the identity of its owner.

Loading began at 1:00 p. m., August 31, within an hour after the ship docked at Westwego Wharf, and continued overtime. On September 2, at 3:00 p. m., while the injunction was still in effect, the stewards left the ship to attend a union meeting, but did not strike. Three hours later the last of the caustic soda was on board and the ship was loading

other cargo. At midnight the injunction expired. At 3:15 a. m. the stewards went on strike, the first the ship's master knew that any of his crew would walk off. At 10:00 that morning the engineroom crew joined the strike, cutting off the steam to the winches and ending further loading operations. While the strike continued it was impossible to do anything with respect to loading or unloading the cargo or sailing from port.

The seller's freight forwarders, not knowing of the work stoppage, paid the freight at 9:30 a. m., September 3, receiving two bills of lading which they mailed to Colorado that day, a Friday. On the Tuesday after Labor Day, September 7, the bills were presented to the bank in New York for payment. Becker learned of the strike in the early afternoon of September 3, but did not inform Colorado of it until September 7 because "the situation was very unclear on September 3rd * * *. It was a temporary situation and we were trying to see how it would progress, and then * * * there was a long weekend occasioned by the Labor Day holiday." 138 F.Supp. 595, 604. Colorado's general traffic manager was surprised by Becker's wire late September 7 or September 8, and his assistant wrote for an explanation. Colorado learned the full story on September 13 and informed the buyer of the facts one week later.

There is no dispute that delivery of the bills of lading on September 7 was timely. But the seller in such circumstances is also obligated to the buyer to put the goods aboard a vessel "in good faith * * * having reason to suppose she would sail within a reasonable time after shipment." Ledon v. Havemeyer, 121 N.Y. 179, 186, 24 N.E. 297, 299, 8 L.R.A. 245. "Shipment" occurred on September 2 when the caustic soda was loaded on board; what constitutes a reasonable delay before sailing depends on the particular contract of sale. Tobias v. Lissberger, 105 N.Y. 404, 12 N.E. 13. Since documents of title could be presented as late as September 22, shipment on September 22 would not be

improper; and it is to be expected that a vessel will take additional time to load other cargo if the shipper is not supplying a whole cargo. Ledon v. Havemeyer, supra, 121 N.Y. 179, 24 N.E. 297. Thus the buyer would certainly have had no complaint had the S.S. Hawaiian sailed September 23. From the exchange of cables and letters which constituted the contract of sale it appeared that part of the goods could be put on board as late as October 9, suggesting that the buyer fixed the September 22 dead line because that was the expiration date of its import license, and not because it feared an immediate market drop. From all this Colorado could properly assume that the buyer would be satisfied with a September 23 sailing, and would accept an October 11 sailing if necessary.

Even if we ascribe to the seller knowledge that the ship had a West Coast crew, the seller could nevertheless reasonably entertain the belief in good faith at the time of loading that the vessel would depart by the second week in October. The duty defined in Ledon v. Havemeyer, supra, 121 N.Y. 179, 24 N.E. 297, was accordingly satisfied. Moreover, Colorado, as we see it, did everything to speed the goods on their way that the buyer could have done had the latter been on the spot and representing its own interests.

The contract with Isbrandtsen made on July 29 was as good a contract as could be had at the time. There was no reason then to be suspicious of a possible substitution of another A-1 vessel. When on August 17 Colorado confirmed the substitution of the S.S. Hawaiian there was still no reason to reject a ship because it had a West Coast crew; the East Coast and Gulf settlements were still in the future, and one crew seemed no more likely to strike than another. Later when it appeared that West Coast crews were less desirable than others, there was no alternative course open which promised more likelihood of prompt sailing. If Colorado broke its contract to use the S.S. Hawaiian and sought another ship with a Gulf or East Coast crew, there was virtually no chance of obtaining space promptly. There was evidence that it takes considerable time to book space for a cargo of that size and that other lines were unwilling to handle caustic soda. Refusing to load until the strike situation was clear involved the same disadvantages. It made far better sense to take a chance that the S.S. Hawaiian would not be struck or would be struck briefly. While it was foreseeable that there would be a strike, it was far less foreseeable that a maritime strike crippling the entire West Coast would last from September 2 past the first week in October; and in the circumstances it was an intelligent business decision to load aboard the S.S. Hawaiian.

■ The plaintiffs' other major argument concerns Colorado's presentation of the bills of lading to the buyer's bank after the strike occurred. Plaintiffs cite a dictum in Ocean S.S. Co. v. U. S. Steel Products Co., 2 Cir., 239 F. 823, 826, certiorari denied 244 U.S. 652, 37 S.Ct. 650, 61 L.Ed. 1373, for the proposition that this constituted fraud. See also 49 U.S.C. § 114(c), which states that one negotiating a bill of lading warrants "That he has knowledge of no fact which would impair the * * * worth of the bill." Assuming that the worth of the bills of lading was impaired by the strike, a fact which was not established below, it was still necessary to prove that Colorado did know of the strike at the time it negotiated the bills. Plaintiffs would have us impute the knowledge of Becker, secretary-treasurer of the freight-forwarding corporation, to Colorado, for it was shown that Becker learned of the strike late on September 3, four days before Colorado presented the documents of title. But Becker was under no duty to keep Colorado informed of strike developments, and consequently his knowledge cannot be imputed to Colorado. 1 Restatement, Agency § 275 (1933). Becker's original deposition indicated that he kept abreast of strike developments and notified shippers if they materialized, but at trial he insisted that

his duty to shippers ended when he delivered bills of lading. The trial court accepted his later version, and we cannot say that this finding was clearly erroneous.

■ Inasmuch as Colorado conducted its freight forwarding through an independent contractor whose reliability is not questioned, and only two vessels in the whole port of New Orleans were affected by the West Coast strike, it cannot properly be charged with constructive notice of the strike before the time Becker cabled the news on September 7. Moreover, we think actual, rather than constructive, knowledge is required in such circumstances. Fenold v. Green, 2 Cir., 175 F.2d 247; Bank of Otterville v. Bank of Boonville, 223 Mo.App. 572, 16 S.W.2d 702.

■ Plaintiffs also named as defendants Isbrandtsen and the owner of the S.S. Hawaiian; but the claims against them, if any, are barred by the one-year statute of limitations in the Carriage of Goods by Sea Act, 46 U.S.C. § 1303(6). Commercio Transito Internazionale, Ltd. v. Lykes Bros. S.S. Co., 2 Cir., 243 F.2d 683.

■ In their briefs the plaintiffs treat the present case as one in which a seller fails to perform and then attempts to establish the defense of impossibility. In such cases the seller has the burden of proving the defense, which often amounts to establishing that the catastrophe which prevented performance was not foreseeable, e. g., L. N. Jackson & Co. v. Royal Norwegian Government, 2 Cir., 177 F.2d 694, certiorari denied 339 U.S. 914, 70 S.Ct. 574, 94 L.Ed. 1340. Here, however, the plaintiffs failed to satisfy the trial court that the seller breached its contract; consequently it was never necessary for the seller to establish the impossibility of its performing.

Affirmed.

HAND, Circuit Judge (dissenting).

We should distinguish between a failure to deliver the cargo at all, and a failure to make timely delivery (in this case on board a ship, September 22). The seller did indeed make delivery under § 127(1) of the New York Personal Property Law, McK.Consol.Laws, c. 41 and at common law, by laying the cargo alongside the ship, and it is also true that this delivery was in season to conform to the date fixed in the contract which was September 22. Nevertheless, it was not such a delivery as the parties contemplated because the ship did not break ground on or about September 22; hence it was not the stipulated performance. If the strike had arisen unexpectedly after the contract of sale was made, perhaps it would have excused the defendant's failure to perform; but, at the time, the situation was such that a West Coast strike might well be resumed after September 1 when the injunction expired; and, that being true, the defendant took the risk that it would be unable to perform. Madeirense do Brasil S/A v. Stulman-Emrick Lumber Co., 2 Cir., 147 F.2d 399. Compare L. N. Jackson & Co. v. Royal Norwegian Government, 2 Cir., 177 F.2d 694. If a seller makes a "reasonable" contract with the carrier "on behalf of the buyer," that the ship will break ground on the stipulated day I will assume that under § 127(2) this would be performance, though she does not do so. However, in the case at bar it was not "reasonable" to assume that the ship selected would be free to break ground on September 22; she might or she might not; no one could tell. That was not enough to absolve the defendant from the implied agreement that it would select a ship, free on September 22. It was fully charged with notice that the ship was from the West Coast and that the strike on that coast had not been settled. It had deputed Becker to select the ship, and Becker had left its selection altogether to Isbrandtsen, an irresponsible subinfeudation of authority. Even a casual inquiry as to whether the ship selected was within the still strike-bound zone, would have disclosed the risk imposed on the plaintiff.

Incidentally Judge Ryan's conclusion that the contract was "reasonable" is not a "finding of fact," reversible only if it is "clearly erroneous"; in a case tried to a judge it is a "conclusion of law."*

I would reverse the judgment and remand to ascertain the damages arising from the delay.

---

* Barbarino v. Stanhope S.S. Co., 2 Cir., 151 F.2d 553, 555; Great Atlantic & Pacific Tea Co. v. Lloyd Brasileiro, 2 Cir., 159 F.2d 661; Kreste v. United States, 2 Cir., 158 F.2d 575, 577; Guerrini v. United States, 2 Cir., 167 F.2d 352, 355; Johnson v. United States, 2 Cir., 168 F.2d 886; Lynch v. Agwilines, Inc., 2 Cir., 184 F.2d 826, 828; Bonnewell v. United States, 4 Cir., 170 F.2d 411, 412; Dale v. Henry P. Rosenfeld, 2 Cir., 229 F.2d 855, 858.

