**The SPORT' SHOE OF NEWARK, INC., a Delaware corporation, Plaintiff,**

**v.**

**RALPH LIBONATI CO., INC., a New Jersey corporation, Libco, Inc., a New Jersey corporation; and Gerald M. Cavall, t/a Girard Sporting Goods, Defendants.**

**Civ. A. No. 76–386.**

United States District Court,
D. Delaware.

April 14, 1981.

David Roeberg, Frederick T. Haase, Jr., and John T. Tolbert, of Roeberg & Associates, P. A., Wilmington, Del., for plaintiff.

Henry N. Herndon, Jr., David H. Williams, and Clark W. Furlow, of Morris, James, Hitchens & Williams, Wilmington, Del., for defendants Ralph Libonati Co., Inc. and Libco, Inc.

Edward J. Sobolewski, Jr., and Bruce E. Hubbard, Newark, Del., for defendant Gerald M. Cavall, t/a Girard Sporting Goods.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

At the conclusion of several years of pretrial discovery in this antitrust case, two of the defendants, Ralph Libonati Co., Inc. ("RLCo.") and Libco, Inc. ("Libco"), have moved for summary judgment. After reviewing the record, the Court concludes that plaintiff has raised a genuine issue of fact that bears on liability, and therefore denies the motion.

### I. Factual Background

Plaintiff, Sport Shoe of Newark, Inc., alleges that the three defendants, RLCo., Libco, and Gerald Cavall ("Cavall"), conspired with each other and with Athlete's Foot Marketing Associates, Inc. ("AFMA") to deprive plaintiff of necessary trade relationships in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

Because, on a motion for summary judgment, the focus must be on disputed facts, the Court will not linger over the agreed facts, which are set out at length in the parties' briefs. Briefly summarized, the relevant facts are as follows. In 1975, Gerald Jarin ("Jarin") entered into a franchise agreement with AFMA granting him the exclusive right to operate Athlete's Foot franchises in New Castle County, Delaware. In February 1976, Jarin and a group of associates opened a franchise on Marsh Road in Wilmington. Shortly after that store was opened, Jarin began making plans to open a franchise in Newark, Delaware. His intention was to lease a site at the Newark Shopping Center, and he sought

and obtained approval of the proposed location from AFMA representative, Mark Lando, as required under the franchise agreement. Jarin also got the approval of the local RLCo. representative. RLCo. is the manufacturer's representative for Libco and Libco was Jarin's Adidas supplier for the Marsh Road store.

Shortly thereafter, Jarin was informed that the Newark Shopping Center site was not available because of a restrictive covenant covering shoe stores there. He investigated other locations, and settled on the premises at 144 E. Main St. Jarin and his associates incorporated Sport Shoe of Newark, Inc. ("Sport Shoe") on April 1, 1976, and Sport Shoe entered into a lease for the 144 Main St. location the following day. The Main Street location is 863 feet west of the proposed Newark Shopping Center site. Jarin did not apprise either AFMA or RLCo. of the change in location.

The Main Street site was two doors away from another retail athletic footwear outlet, Girard Sporting Goods, which was operated by defendant Cavall. Like Jarin, Cavall purchased the Adidas line from Libco. Cavall called Libco, as well as his other suppliers, when he noticed a sign in the window at 144 E. Main St. indicating that a shoe store would be opening there. Cavall spoke with the RLCo. sales representative, and, in a subsequent telephone call, with Ralph Libonati, the president of both RLCo. and Libco. A number of telephone conversations ensued between Libonati, Lando of AFMA, and Jarin, the substance of which is in dispute. On April 17, 1976, Jarin, one of his associates, and the lessor of 144 E. Main Street, and Cavall met together to discuss whether Cavall's store and Jarin's proposed store could coexist. At that meeting, Cavall indicated his view that they could not. Soon thereafter, Jarin abandoned plans for opening a store at 144 Main Street, because Libco refused to sell to him at that location, and AFMA refused to approve a franchise at that location.

The complaint was filed in November, 1976. On defendants' motion, this Court dismissed a number of the parties, *see Ath-*

*lete's Foot of Delaware, Inc. v. Ralph Libonati Co., Inc.,* 445 F.Supp. 35 (D.Del.1977). The remaining parties undertook extensive discovery. A trial date was eventually set, and defendants filed this motion following the pre-trial conference.

## II. *Legal Issues*

 It is axiomatic that a motion for summary judgment can be granted only if there is "no genuine issue as to any material fact," Fed.R.Civ.P. 56(c). In determining whether there are disputed factual issues, the Court must view the record in general, and any specific factual inferences, in the light most favorable to the non-moving party. *See* 6 *Moore's Federal Practice* ¶ 56.-17[5] (2d ed. 1948). Moreover, sparing use should be made of summary procedures in complex antitrust litigation. *See, e. g., Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *Cernuto, Inc. v. United Cabinet Corp.,* 595 F.2d 164, 165 n.2 (3d Cir. 1979).

In support of their motion, defendants assert three independent arguments as to why they are entitled to judgment as a matter of law. The first and most substantial of these arguments assumes *arguendo* an agreement or conspiracy among the defendants, and states that defendants' conduct is nevertheless not actionable under § 1 of the Sherman Act because it was not a *per se* violation and there was no adverse effect on competition. According to plaintiff's allegations, defendants' actions are illegal *per se*, as either a group boycott or a horizontal allocation of markets. The second of these theories will be examined first.

 It is now a settled issue that horizontal market division is a *per se* violation of § 1 of the Sherman Act. *United States v. Topco Associates, Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). It is equally clear that no adverse effect need be shown to have resulted from the proscribed practice; the restraint is conclusively presumed to be unreasonable. *See, e. g., Northern Pacific Railroad Co. v. United*

*States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Under plaintiff's theory of the case, one of plaintiff's potential competitors on Main Street, Cavall, pressured his supplier, Libco, and its representative, RLCo., not to supply plaintiff at its Main Street location. Plaintiff further contends that Libco and RLCo. pressured AFMA not to approve the 144 Main St. location for a franchise. Defendants, on the other hand, contend that Libco's decision not to supply Jarin's Main Street store with Adidas goods, and AFMA's decision not to approve the Main Street location for a franchise, were unilateral business judgments based on Libco's and AFMA's respective marketing strategies.

There are two disputed facts in the record which, when viewed in the light most favorable to plaintiff, indicate that defendants sought primarily to protect Cavall from competition, rather than to pursue their own business objectives. First, Harold Jarin alleges that Ralph Libonati told him that Libco would delay any further shipments of shoes to the Marsh Road store "until something is resolved in Newark." H. Jarin Dep. at 13. Libonati denies having made that statement. R. Libonati Dep. at 55. Assuming that Libonati delayed shipments to Jarin's Marsh Road store after he received a call from Cavall, one can infer that Libonati's aim was to block the opening of that store to protect Cavall. Had Libonati been concerned only with Newark's ability to support two Adidas outlets, he would simply have refused to supply Adidas to Jarin's store in Newark; he would have been indifferent as to whether the store opened.

Second, Gerald Jarin contends that Libonati told him that Libonati would supply him with Adidas goods at 144 Main St. if Jarin could persuade Cavall to drop his objections. G. Jarin Dep. at 120. Libonati denies having made this statement. R. Libonati Dep. at 54–55. Obviously, if Libonati's principal concern was whether Newark could support two Adidas outlets, *see* R. Libonati Dep. at 39–41, then it would have made no sense for him to give Cavall a veto over whether Libonati would supply Jarin.

These inferences suggest that Libonati's refusal to supply Jarin at 144 Main St., though it appears to be a vertical restraint, is primarily horizontal, intended to restrain competition among retailers. On similar facts, the Third Circuit recently held that a *per se* theory might apply. *Cernuto, Inc. v. United Cabinet Corp., supra*. In *Cernuto*, a manufacturer of kitchen cabinets terminated its contract to supply cabinets to a discount house, at the urging of another of its customers, a competitor of the discount house. The Court relied equally on the horizontal nature of the restraint and allegations concerning price-fixing in holding that plaintiff might make out a *per se* violation, and reversing the district court's grant of summary judgment.

Though the instant case involves no allegations of price-fixing, *see* Plaintiff's Amended Answers to Second Interrogatories, No. 7, the Court believes that a *per se* theory may still apply to this case. That conclusion finds support in the Third Circuit's decision in *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230 (3d Cir. 1975). The case involved, *inter alia*, the legality of a practice whereby Holiday Inns, the franchisor, gave "veto" power over a franchise application to the three franchisees nearest to the proposed franchise site. The Court, *per* Judge Adams, held that the system constituted a horizontal market allocation, and was therefore *per se* unlawful. *Id.* at 1243. Taken together, *American Motor Inns* and *Cernuto* indicate that if Libonati undertook his refusal to deal in order to restrain or eliminate competition at the retail level, at Cavall's urging, defendants committed a *per se* violation. *See* Sullivan, *Antitrust* 217 (1977). Obviously, on the record here, the Court must assume that Libonati gave Cavall a veto over the decision whether to supply Jarin at 144 Main Street.

The instant case can be distinguished on its facts from *Top-All Varieties, Inc. v. Hallmark Cards, Inc.*, 301 F.Supp. 703 (S.D. N.Y.1969). In *Top-All*, Hallmark refused to supply its line of greeting cards to a new

franchise of Top-All in Tarrytown, N. Y., because of an exclusive dealership arrangement it had with another store there. The action was dismissed on the pleadings for failure to state a claim. The complaint in that case "simply alleges an agreement between a manufacturer and distributor allocating a specific limited territory exclusively to the distributor with competitive products readily available to others." *Id.* at 705. Plaintiff did not allege that the restraint on competition at the horizontal level was anything other than ancillary to Hallmark's protecting its own business. Moreover, to the extent that *Top-All* may be inconsistent with *Cernuto* and *American Motor Inns*, this Court is guided by the reasoning of the Third Circuit.

Defendants argue that there can be no § 1 violation if there has been no adverse impact on competition, and that, because no adverse impact has been shown here, it would be inappropriate to apply a *per se* rule. This confuses the logic of the antitrust case law. Once it becomes clear, upon analysis of the *type* of restraint involved in a case that a *per se* violation is involved, adverse impact is conclusively presumed to flow from the restraint. *Klor's v. Broadway-Hale Stores*, 359 U.S. 207, 211, 79 S.Ct. 705, 708, 3 L.Ed.2d 741 (1959). Though, on the facts of this case, the effect of defendants' refusal to supply Jarin at 144 Main Street may have been *de minimis*, that is irrelevant to the determination whether *per se* or "rule of reason" analysis applies. With regard to *per se* violations, "it was not for the courts to decide whether in an individual case injury had actually occurred." *Id.*

Turning to the other grounds advanced by defendants in support of their motion, the Court holds that neither provides a sufficient basis for granting the motion. First, defendants contend that Libco and RLCo. function as a single economic unit, and that they cannot, therefore, have conspired together. However, even acting as a single unit, they might still have conspired with Cavall and AFMA in violation of § 1. While defendants contend that that trilogy of actors could not have committed a *per se*

violation because no two are at the same level of production, the teaching of *Cernuto* is to the contrary.

Also, defendants argue that plaintiff was not a proper licensee of AFMA, and therefore has no standing to complain of AFMA's failure to approve the Main Street location. Assuming this to be true, it again provides no basis for granting summary judgment to these defendants. Given the Court's holding, *supra*, that a *per se* violation might be made out on the basis of a horizontal allocation agreement between Cavall and Libonati, AFMA's involvement in the conspiracy is not essential to plaintiff's case.

In summary, the Court holds that defendants may have committed a *per se* violation, viewing the record in the light most favorable to plaintiff. The Court recognizes, of course, that defendants may establish at trial that Libonati's motive was primarily to protect his own business interests rather than to protect Cavall from competition. However, on a motion for summary judgment, the Court cannot base its ruling on the probable outcome at trial, or on the bulk of evidence in the record. The Court concludes that there is a genuine issue of fact as to defendants' motive, and therefore denies the motion for summary judgment.