**ZIDELL EXPLORATIONS, INC., an Oregon corporation, Plaintiff-Appellee,**

v.

**CONVAL INTERNATIONAL, LIMITED, a Delaware corporation, the Lunkenheimer Company, a Delaware corporation, Conval Corporation, a New York corporation, Defendants-Appellants.**

Nos. 82–3511, 82–3541.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 6, 1983.

Decided Nov. 10, 1983.

Charles F. Adams, Stoel, Rives, Boley, Fraser & Wyse, Portland, Or., for plaintiff-appellee.

Wayne Hilliard, Craig D. Bachman, Spears, Lubersky, Campbell & Bledsoe, Portland, Or., Michael Blechman, Robert B. Bernstein, Kaye, Scholer, Fierman, Hays & Handler, New York City, for defendants-appellants.

Before CHOY and CANBY, Circuit Judges, and MARQUEZ,* District Judge.

CHOY, Circuit Judge:

This antitrust and breach of contract suit arose out of the termination by a supplier of one of its distributors. The jury found for the plaintiff distributor and the plaintiff was awarded in excess of $5 million in damages. Defendants appeal, contending that the trial court improperly took from the jury the resolution of certain material issues and gave improper instructions on the issues left for the jury to decide. As we agree with at least some of defendants' contentions, we reverse and remand.

## I. Statement of Facts

Appellants Conval Corporation ("Conval") and The Lunkenheimer Company ("TLC")[1] are brother-sister corporations, both wholly owned subsidiaries of Condec Corporation. Appellant Conval International, Limited ("CIL") is a wholly owned subsidiary of Conval. All are involved in the sale of cast steel industrial valves under the Lunkenheimer brand name. CIL handled the sale of foreign-made valves, while TLC handled the sale of domestic valves within the United States.

Appellee Zidell is the nation's largest distributor of foreign-made industrial valves. In March 1978, CIL and Zidell discussed a proposal to make Zidell the exclusive distributor of foreign-made Lunkenheimer valves. The valves were manufactured under license by Energoinvest, a Yugoslavian company, and imported into the United States by CIL. Under the proposed exclusive distributorship agreement, Zidell agreed to buy a minimum of $5 million per annum of valves from CIL. Prices were to be negotiated concurrently with and in relationship to price changes made by Energoinvest. There was some evidence that CIL attempted to avoid disclosing the existence of the agreement to TLC, the manufacturer of domestically produced Lunkenheimer valves. The imported valves were priced about 40% lower than their domestic counterparts, and CIL apparently feared that TLC would view the Zidell agreement as a threat to its sales of domestic Lunkenheimer valves. CIL sold several orders of valves to Zidell at what CIL calls "distress" prices. It now contends that those prices were not intended to be the regular prices under the agreement, but were merely intended to clear a large backlog of inventory. Through July 1978, CIL actively aided Zidell in its efforts to market the foreign-made valves.

---

* The Honorable Alfredo C. Marquez, United States District Judge for the District of Arizona, sitting by designation.

1. Appellants assert that there are two The Lunkenheimer Companies, one of which is an inactive corporation that serves as a name and trademark holding company. We refer to the active company throughout this opinion as TLC, although at some point TLC became a division of a separate subsidiary of Condec Corp. called CDV, Inc.

In July 1978, after complaints from TLC's distributors, officers of TLC began to protest the Zidell agreement, citing the damaging effect of marketing foreign-made valves on domestic valve sales. Following these protests, CIL wrote to Zidell claiming that Zidell had never returned a signed copy of the exclusive distributorship agreement. Zidell presented CIL a copy of the signed agreement and a forwarding cover letter dated June 12, 1978, and CIL agreed to honor the contract.

However, a series of disputes soon ensued. CIL refused to honor several orders placed by Zidell, claiming that Zidell was attempting to place those orders at "distress" prices that were no longer in effect. CIL presented Zidell with a new price list, but Zidell insisted that the old prices were to govern until CIL actually faced price increases from Energoinvest. After rejecting several large orders placed by Zidell, CIL charged that Zidell was not ordering at the minimum $5 million level stipulated in the contract and attempted to terminate the contract. Zidell tried to obtain foreign-made Lunkenheimer valves directly from Energoinvest, but found that CIL had demanded that Energoinvest make no such sales. When Energoinvest refused to produce certain large valves ordered by Zidell through CIL, CIL did not seek to compel Energoinvest to perform or attempt to deliver substitute goods; it simply refused to honor the contract with Zidell. Zidell began to withhold payment to CIL in an effort to force CIL to honor its orders.

In December 1978, CIL notified Zidell that it would be terminated as exclusive distributor effective January 31, 1979. Upon CIL's termination of Zidell, CIL and TLC worked jointly to establish a distribution network for foreign-made Lunkenheimer valves. The foreign-made valves were distributed through basically the same channels as were the domestic valves. Still anxious to purchase Lunkenheimer valves, but unwilling to pay what it considered to be "extraordinarily high" prices quoted by CIL, Zidell attempted to purchase the valves through European traders. Zidell found the European traders unwilling to

deal because of restrictions in their contracts with Energoinvest.

Zidell then brought the present action in the United States District Court for the District of Oregon, charging CIL with breach of contract and all defendants with conspiracy to violate the antitrust laws. The jury returned a special verdict, finding that Condec Corp., Conval, CIL, and TLC had engaged in a combination or conspiracy in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. The jury found antitrust damages of $2,972,357. The jury was instructed that CIL breached its contract with Zidell, and the parties stipulated that the amount of damages would be the same as the antitrust damages. After post-verdict motions, the district court ordered a remittitur to which Zidell agreed, and on June 16, 1982, entered an amended judgment in the amount of $5,155,746.77.

## II. *Capacity to Conspire*

■ Defendants first assert that the district court erred in instructing the jury that they were capable of conspiring to violate the antitrust laws although they were all owned by Conval. We agree.

In *Murray v. Toyota Motor Distributors, Inc.,* 664 F.2d 1377, 1379 (9th Cir.), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2905, 73 L.Ed.2d 1314 (1982), this court held that the question of capacity to conspire is one of fact, and that it was reversible error to take the issue from the jury if reasonable minds could differ as to its resolution. Here, Conval, CIL, and TLC are all subsidiaries of Condec Corp., and there is evidence indicating that all of the defendants were publicly held out as parts of a single business entity known as the Condec Flow Control Group. If the jury found that the Group in fact could be viewed realistically as a single economic entity, it would be justified in concluding that the defendants were incapable of § 1 conspiracy. *General Business Systems v. North American Phillips Corp.,* 699 F.2d 965, 980 (9th Cir.1983); *Thomsen v. Western Electric Co.,* 680 F.2d 1263, 1266–67 (9th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 348, 74 L.Ed.2d 387 (1982);

*Las Vegas Sun, Inc. v. Summa Corp.,* 610 F.2d 614, 617–18 (9th Cir.1979), *cert. denied,* 447 U.S. 906, 100 S.Ct. 2988, 64 L.Ed.2d 855 (1980); *Harvey v. Fearless Farris Wholesale, Inc.,* 589 F.2d 451, 455–57 (9th Cir. 1979).

■ Zidell argues that defendants waived their right to have the jury decide this issue, pointing to the following colloquy at trial:

THE COURT: Well, you know that I'm going to be the one that decides whether or not these companies are single economic entities and are capable of conspiring. You know that I'm going to decide that and not the jury, don't you?

MR. HILLIARD: Well, if that be the case, that's fine, Your Honor. Then this is testimony you should hear.

(Tr. at 1005.) Mr. Hilliard's remarks could be interpreted either as a waiver of his clients' right to a jury determination of that issue or a mere acquiescence in the trial judge's directive. However, a waiver of the right to trial by jury on an issue so triable must be clearly proved; equivocal remarks will not suffice. *Palmer v. United States,* 652 F.2d 893, 896 (9th Cir.1981); *Pradier v. Elespuru,* 641 F.2d 808, 811 (9th Cir.1981); *Franks v. United States Lines Co.,* 324 F.2d 126, 127 n. 1 (2d Cir.1963).

Zidell also points out that *Murray* was decided subsequent to the verdict in this case, and that the question of whether capacity to conspire was an issue of fact or of law was unresolved prior to *Murray. See, e.g., Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.,* 467 F.Supp. 841, 859 n. 15 (N.D.Cal.1979), *aff'd sub nom. Murphy Tugboat Co. v. Crowley,* 658 F.2d 1256 (9th Cir.1981), *cert. denied,* 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982). Even if we were to decide that *Murray* should only be prospectively applied, however, the district court did have the *Murray* decision before it on a post-trial motion. At that point, the litigation had not been terminated so *Murray* would have to be applied. *Linkletter v. Walker,* 381 U.S. 618, 627, 85 S.Ct. 1731, 1736, 14 L.Ed.2d 601 (1965); 1B J. Moore, *Moore's Federal Practice* ¶ 0.404[10], at 575–76 (2d ed. 1965).

### III. *Per Se Illegality*

Defendants argue that the district court committed reversible error in applying the theory of per se illegality set forth in *Cernuto, Inc. v. United Cabinet Corp.,* 595 F.2d 164 (3d Cir.1979), to this case, or in improperly instructing the jury on the *Cernuto* per se rule. We conclude that the jury was properly instructed.

■ The rule announced in *Cernuto* and followed in this circuit is that if a manufacturer deliberately withdraws its product from a price-cutting distributor at the request of a competing distributor as part of a conspiracy to protect the requesting distributor from price competition, the manufacturer has committed a per se violation of the antitrust laws. *Id.* at 170. Here, Zidell alleges that CIL effectively terminated the Zidell distributorship agreement at the request of its sister company, TLC, to protect TLC's distributors of domestic Lunkenheimer valves from price competition by Zidell. While the facts here differ from those in *Cernuto* because TLC conspired as a manufacturer rather than as a distributor, the object of the conspiracy was still to protect TLC's distributors from price competition by Zidell. As in *Cernuto,* the purpose and the impact of the conspiracy is to restrain price competition among distributors. It is therefore appropriate to apply the *Cernuto* per se rule here.

■ Defendants assert that the manufacturer must be motivated *solely* by considerations of price in order to come within the *Cernuto* rule. Accordingly, they complain of the following instruction given to the jury:

The agreement or conspiracy need not be solely motivated by a desire to protect the Lunkenheimer Company from Zidell's price competition. But this anti-competitive purpose must be a primary purpose in the parties' decision to enter into the agreement or conspiracy.

■ Per se violations of the antitrust laws are specific exceptions to the general rule of reason, which are applied to "agreements or practices which because of their

pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal ...." *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Although unilateral action by a manufacturer in terminating a distributor is ordinarily not a subject for per se attack, *see, e.g., Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *A.H. Cox & Co. v. Star Machinery Co.,* 653 F.2d 1302, 1306–07 (9th Cir.1981), such action taken in response to a competing distributor's complaint and with intent to restrain price competition has been treated differently. The reason is this:

> When a manufacturer acts on its own, in pursuing its own market strategy, it is seeking to compete with other manufacturers by imposing what may be defended as reasonable vertical restraints. ... However, if the action of a manufacturer or other supplier is taken at the direction of its customer, the restraint becomes primarily horizontal in nature in that one customer is seeking to suppress its competition by utilizing the power of a common supplier.
>
> ....
>
> ... If the purpose and effect of the challenged conduct is to restrain price movement and the free play of market forces, it is then illegal *per se.* ... By prevailing upon United and Lappin to terminate their contract with Cernuto, Famous effectively eliminated the threatened competition and was able to maintain prices at its own preferred levels. It is just this type of conduct that the antitrust laws were designed to reach.

*Cernuto,* 595 F.2d at 168–69.

■ With that rationale for the rule, we do not find it appropriate to limit the *Cernuto* rule, as it is applied in this circuit, to the single scenario of one distributor conspiring with a common supplier to cut off a competing distributor. Viewing the evidence in this case in the light most favorable to the plaintiff, a jury could find that a domestic supplier (TLC) of a branded product conspired with a supplier of foreign-made products of the same brand for the purpose of protecting the domestic supplier's distributors from intrabrand price competition by another distributor (Zidell).[2] Those facts would establish a conspiracy to lessen or eliminate intrabrand competition by imposition of a horizontal price restraint. The *Cernuto* per se rule was fashioned to attack a conspiracy giving rise to a restraint "horizontal in purpose and effect" in which the complaining dealer seeks to eliminate price competition. *JBL Enterprises, Inc. v. Jhirmack Enterprises, Inc.,* 698 F.2d 1011, 1015 (9th Cir.1983), *petition for cert. filed,* 52 U.S.L.W. 3002 (U.S. June 28, 1983) (No. 82–2137). The price restraint imposed by the conspiracy justifies application of a per se rule. *See, e.g., National Society of Professional Engineers v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978); *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 221, 60 S.Ct. 811, 843, 84 L.Ed. 1129 (1940). A domestic supplier or manufacturer of a product may be legitimately concerned about imports of the same product from foreign countries with lower labor costs. We hold, however, that it may not solve its problem by conspiring with the supplier of the foreign imports (here, CIL) to protect its distributors from price competition by other distributors.

■ We now turn to the degree to which anticompetitive motive must be shown. The courts are currently split into those that require an anticompetitive purpose to be the *sole* motivating factor in a

2. Defendants assert that CIL merely replaced Zidell's exclusive distributorship with a number of non-exclusive distributorships, and thus promoted interbrand competition. Zidell, however, introduced evidence showing that CIL granted those non-exclusive distributorships to the very same companies which formed TLC's distribution network for domestic valves.

Because we are not dealing with the substitution of one exclusive dealer for another exclusive dealer for business reasons sufficient to the supplier, such cases as *Golden Gate Acceptance Corp. v. General Motors,* 597 F.2d 676 (9th Cir.1979), and *Chandler Supply Corp. v. GAF Corp.,* 650 F.2d 983 (9th Cir.1980), relied upon by the partial dissent, are distinguishable.

distributor termination, *Davis-Watkins Co. v. Service Merchandise,* 686 F.2d 1190, 1200 n. 13 (6th Cir.1982), *petition for cert. filed,* 51 U.S.L.W. 3421 (U.S. Nov. 19, 1982) (No. 82–848); *Cernuto,* 595 F.2d at 170 (dictum), and those that require it to be a motivating factor or a primary motivating factor in the decision, *Spray-Rite Service Corp. v. Monsanto Co.,* 684 F.2d 1226, 1234 (7th Cir.1982) (dictum), *cert. granted,* —— U.S. ——, 103 S.Ct. 1249, 75 L.Ed.2d 479 (1983); *Battle v. Lubrizol Corp.,* 513 F.Supp. 995, 999 (E.D. Mo.1981), *aff'd by an equally divided court,* 712 F.2d 1238 (8th Cir.1983) (en banc); *Sport Shoe of Newark, Inc. v. Ralph Libonati Co.,* 512 F.Supp. 921, 925 (D.Del.1981). We believe it appropriate to apply a per se rule to cases in which the supplier's primary motivation for its decision to terminate a customer is anticompetitive.

At the outset, we note that it seems unrealistic to adopt the "sole motive" test of *Davis-Watkins.* Corporate motives in modern antitrust cases are easy to manufacture and hard to disprove. We have recognized that conventional indications of corporate purpose tend to drift away from the corporate actors' actual intent at the time, and instead miraculously converge around corporate counsel's post hoc determinations of what that intent should have been. *Continental T.V., Inc. v. GTE Sylvania Inc.,* 694 F.2d 1132, 1139 n. 16 (9th Cir.1982); *see* Pitofsky, *The* Sylvania *Case: Antitrust Analysis of Non-Price Vertical Restrictions,* 78 Colum.L.Rev. 1, 35 (1978). Moreover, at least some element of self-interest motivates a supplier when it decides to yield to its customers' desires and rid them of a price cutter. *See Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 678 F.2d 742, 744 (7th Cir.1982) (Posner, J.).

At the same time, however, we recognize the "redeeming virtue" in allowing suppliers to pursue their own legitimate business interests. *See, e.g., Krehl v. Baskin-Robbins Ice Cream Co.,* 664 F.2d 1348, 1356–57 (9th Cir.1982); *A.H. Cox & Co. v. Star Machinery Co.,* 653 F.2d 1302, 1306 (9th Cir.1981). This court held in *Cox* that a decision based on independent business judgment is not per se illegal even if a customer "initiated contact or actively

sought the change." 653 F.2d at 1307. It follows that corporate action might not be per se illegal even if the plaintiffs can demonstrate that the defendants had some anticompetitive purpose in mind.

■ When restraint of competition is the primary or predominating impetus behind the supplier's actions, however, it is difficult to find redeeming virtue. In order to find that the supplier's primary motive is anticompetitive, the jury will be asked whether any of the supplier's asserted motives were an actual, bona fide pursuit of a legitimate business purpose, or were instead rationalizations for illegal conduct, afterthoughts possibly injected in response to legal advice after the fact, or were otherwise subsidiary to the supplier's anticompetitive intention. If the jury finds that the supplier's suggested legitimate motivations pale in significance by comparison to the illegal motive, the subsidiary motives will not detract from the supplier's "mutual commitment [with the complaining customer] to an anticompetitive course" which is the core of the classic conspiracy in restraint of trade. L. Sullivan, *Handbook of the Law of Antitrust* § 109, at 312 (1977).

■ Nor does a post hoc assessment concluding that the challenged conduct actually promoted competition justify the conduct. Conduct which is per se illegal is illegal without regard to its specific effect on competition. *See Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). When conduct is per se illegal, the end does not justify the means.

Thus, although the jury instruction given is not the clearest statement of the law under *Cernuto,* it is not erroneous and it is not misleading. It was not reversible error to give it. *See Van Cleef v. Aeroflex Corp.,* 657 F.2d 1094, 1099 (9th Cir.1981).

■ The foregoing discussion also disposes of most of defendants' claims that *Cernuto* does not apply to this case as a matter of law. Defendants also make the argument that *Cernuto* should not be applied here because CIL was selling Lunkenheimer valves to Zidell at preferential or "distress" prices, and this court has recog-

nized that it is not a per se violation for a supplier to withdraw preferential pricing from a favored dealer. *Westinghouse Electric Corp. v. CX Processing Laboratories,* 523 F.2d 668, 675–76 (9th Cir.1975). Whether the prices CIL charged Zidell were preferential is a question of fact and will have to await retrial for resolution.

## IV. *Breach of Contract*

Both parties had stipulated that the district judge could decide the issue of whether a contract had been formed and could determine the terms of that contract. The judge, however, went further and also decided the question of breach, leaving only the question of the amount of damages to the jury. Defendants argue that it was reversible error to direct a verdict on the issue of breach. Zidell contends that no question of material fact remained once the terms of the contract had been decided.

Specifically, the district court instructed the jury that the contract had been breached in three respects: first, that CIL did not deliver an order for large valves placed by Zidell in March 1978; second, that CIL failed to fill Zidell's order for $3 million in valves placed in August 1978; and third, that CIL terminated the contract prematurely. The district court effectively directed a verdict on those three issues, meaning that we must view the evidence in the light most favorable to the defendants and allow the directions to stand only if reasonable minds could not differ on the issues on which the verdict was directed.

### A. *The Large Valve Order*

According to the district court, CIL's failure to fill a Zidell order for large valves constituted a breach. CIL does not dispute that the order in fact was not filled, but it claims that Energoinvest refused to manufacture valves of that size, and that this refusal rendered CIL's performance under the contract impossible under Or.Rev.Stat. § 72.6150 (U.C.C. § 2–615). In order for the district court to direct a verdict on the issue of breach, it must have found, as a matter of law, that the defense of § 72.6150 did not apply. We think the evidence was sufficient to reach the jury on this question.

Defendants apparently concede that the evidence did not support an inference that their failure to perform was excused by the defense of impossibility unless the contract at issue was a contract involving an agreed source. *Cf. Savage v. Peter Kiewit Sons' Co.,* 249 Or. 147, 152–54, 432 P.2d 519, 522–23 (1967) (discussing doctrine of impossibility). Here, however, the district court explicitly construed the contract to mean that "Zidell was to be the exclusive distributor in the United States of Lunkenheimer International valves. In other words, of the Lunkenheimer International valves *that were manufactured by Energoinvest in Yugoslavia.*" (Tr. 1472.) (Emphasis Added.) We see no error in this construction. The price charged by CIL to Zidell was keyed to the price charged by Energoinvest to CIL; it is difficult to imagine a contract with such a provision in which there was no agreed source.

Given that the contract involved an agreed source, the provisions in U.C.C. § 2–615 official comment 5 are pertinent. The thrust of that comment is that a seller claiming the benefit of a commercial impracticability defense when the contract contemplates an agreed source must ordinarily show two things: (1) the seller must have employed "all due measures" to assure that the agreed supplier would perform; and (2) the seller must have turned over to the aggrieved buyer its rights against the supplier corresponding to the seller's claim of excuse.

With respect to the first element, defendants point out that an official of CIL testified that he followed up with Energoinvest "many times" to prevail upon it to produce the valves and that CIL sent representatives to Energoinvest's manufacturing plant in Yugoslavia to persuade Energoinvest to manufacture the valves. Viewing the evidence in the light most favorable to CIL, it is possible for reasonable minds to conclude that CIL employed "all due measures" to assure performance by Energoinvest.

With respect to the second element, Zidell asserts that there is no evidence to

the effect that defendants turned over to them any rights of any kind against Energoinvest. Defendants do not dispute this assertion. However, the inquiry does not end there. The relevant portion of official comment 5 to U.C.C. § 2–615 reads as follows:

> [An excuse under this section] should not result in relieving the defaulting supplier from liability nor in dropping into the seller's lap an unearned bonus of damages over. The flexible adjustment machinery of this Article provides the solution under the provision on the obligation of good faith. A condition to his making good the claim of excuse is the turning over to the buyer of his rights against the defaulting source of supply to the extent of the buyer's contract in relation to which excuse is being claimed.

The condition of tendering rights, as stated in the comment, cannot be discerned from the language of U.C.C. § 2–615 alone. It is certainly one fact suggesting that CIL did not act consistently with the obligation of good faith imposed by U.C.C. § 1–203, Or. Rev.Stat. § 71.2030. We decline to hold, however, that a failure to tender rights against the supplier constitutes a per se violation of the obligation of good faith.[3] It is not hard to imagine situations in which a seller could reasonably and in good faith conclude that immediately delivering a lawsuit into the hands of the buyer would be counterproductive for all parties concerned. Moreover, "[r]ather than mechanically apply any fixed rule of law, where the parties themselves have not allocated responsibility, justice is better served by appraising all of the circumstances, the part the various parties played, and thereon determining liability." *Mishara Construction Co. v. Transit-Mixed Concrete Corp.*, 365 Mass. 122, 130, 310 N.E.2d 363, 368 (1974) (interpreting U.C.C. § 2–615) (quoting *Badhwar v. Colorado Fuel & Iron Corp.*, 138 F.Supp. 595, 607 (S.D.N.Y.1955), *aff'd*, 245 F.2d 903 (2d Cir.1957)). On remand, therefore, the jury should be instructed to decide whether, given all facts and surrounding circumstances, CIL acted consistently with its obligation of good faith and fair dealing in failing to tender to Zidell its rights against Energoinvest relating to its contractual obligations to Zidell.

**B.  *The $3 Million Order***

■ The district court also instructed the jury that CIL's failure to honor the $3 million order placed by Zidell constituted a breach. CIL does not dispute the fact that it did not honor the order, but it does claim that the prices Zidell insisted on were "distress" prices, or that they were prices in effect only prior to the negotiation of the distribution agreement and therefore not binding on CIL. We think that reasonable minds could differ on whether CIL was bound by its May 1978 prices, so taking this issue from the jury was error as well.

**C.  *Termination of the Agreement***

■ Finally, the district court decided that the contract was terminated prematurely by CIL. The distributorship agreement did not state any definite ending date, so the applicable provision of the U.C.C. is Or.Rev.Stat. § 72.3090(2) (U.C.C. § 2–309(2)), which provides that when an agreement is "indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party." The district judge concluded that the "contract could not be terminated before the expiration of a reasonable time." We think the district judge misinterpreted the law.

■ When no minimum duration is stated in a contract, the general rule is that it is terminable at will by either party, *Aaron E. Levine & Co. v. Calkcraft Paper Co.*, 429 F.Supp. 1039, 1050 (E.D.Mich.1976), subject to two limitations. One is the obligation to give reasonable notice, where the reasonableness of the notice is judged by the amount of time necessary to enable the distributor to look for a new source of supply. *Id.; see* Or.Rev.Stat. § 72.3090(3); U.C.C. § 2–309 official comment 8. The other is the general obligation to act in good faith as stated in Or.Rev.Stat. § 71.-2030 (U.C.C. § 1–203). *Tele-Controls, Inc. v. Ford Industries, Inc.*, 388 F.2d 48, 51 (7th

---

**3.** Zidell has cited no case which has so held, nor have we found any.

Cir.1967) (interpreting Oregon law); *accord Atlantic Richfield Co. v. Razumic*, 480 Pa. 366, 377–78, 390 A.2d 736, 741–42 (1978). The issue is thus one of fact to be decided by the jury.

### V. *Conclusion*

We do not mean to suggest by this opinion that the resolution on retrial of the issues erroneously taken from the jury would be or should be different from the resolution made by the trial judge. However, defendants are entitled to that retrial. We therefore find it unnecessary to consider defendants' other contentions of error now. We also find it unnecessary to rule on the issues raised by the cross-appeal, because all issues on breach of contract are interrelated and will have to be retried.

REVERSED and REMANDED.

MARQUEZ, District Judge, dissenting and concurring in part:

I respectfully dissent.

This is not a typical case where one distributor conspires with his supplier to terminate a price cutting distributor of the same supplier.

TLC was not a distributor of CIL's product.

Viewing the evidence in the strongest light favorable to Zidell, the jury could find that:

1) The officers of TLC protested to CIL about the damaging effect the sale of lower priced foreign-made valves was having on its domestic valve sales.

2) TLC asked CIL to take away the exclusive distributorship from Zidell and give it to TLC.

3) At TLC's request CIL took the exclusive distributorship from Zidell and gave it to TLC.

4) CIL and TLC proceeded to establish a distribution system of the foreign-made valves through TLC's distributors.

Zidell admits that it cannot prove any anti-competitive effect as a result of this action. There is no evidence of intent to fix prices or to restrain trade nor is there evidence of a conspiracy to monopolize or attempt to monopolize. Zidell is the nation's largest distributor of foreign-made valves. There is no claim that other foreign-made valves are not available to Zidell.

Only unreasonable restraints of trade are unlawful. *Standard Oil Company of New Jersey v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

In *Packard Motor Company v. The Webster Motor Car Co.*, 243 F.2d 418, 421 (D.C. Cir.1957), the Court of Appeals for the District of Columbia, in reversing the trial court stated:

When an exclusive dealership "is not part and parcel of a scheme to monopolize and effective competition exists at both the seller and buyer levels, the arrangement has invariably been upheld as a reasonable restraint of trade. In short, the rule was virtually one of *per se* legality" until the District Court decided the present case. . . . The fact that any other dealers in the same product of the same manufacturer are eliminated does not make an exclusive dealership illegal; it is the essential nature of the arrangement. The fact that Zell asked for the arrangement does not make it illegal. Since the immediate object of an exclusive dealership is to protect the dealer from competition in the manufacturer's product, it is likely to be the dealer who asks for it."

The Ninth Circuit has consistently held that it is not a violation of the Sherman Act for a manufacturer to conspire with others to simply switch distributors of one of its exclusive franchises and to cease doing business with a former dealer. *Golden Gate Acceptance Corp. v. General Motors*, 597 F.2d 676 (9th Cir.1979). *Chandler Supply Company v. GAF Corp.*, 650 F.2d 983 (9th Cir.1980).

In *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 76 (9th Cir.1969), *cert. den.* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1969), *reh. den.* 397 U.S. 1003, 90 S.Ct. 1113, 25 L.Ed.2d 415 (1969), the court said:

Not every agreement is per se "in restraint of trade" within the meaning of § 1. See *White Motor Company v. United States* (1963) [372 U.S. 253] 83 S.Ct.

696 [9 L.Ed.2d 738]. Thus, it is well settled that it is not a per se violation of the antitrust laws for a manufacturer or a supplier to agree with the distributor to give him an exclusive franchise, even if this means cutting off another distributor. *United States v. Arnold Schwinn & Co.,* 1967, 388 U.S. 365, 336, 87 S.Ct. 1856, 18 L.Ed.2d 1249; (other citations omitted).

The court went on to state:

> Here, plaintiff presented no evidence whatsoever that either Seagram or Barton had any anticompetitive motive for terminating plaintiff as their distributor.
>
> \* \* \* \* \* \*
>
> We think it indisputable that a single manufacturer or seller can ordinarily stop doing business with A and transfer his business to B .... And the decisions cited, *supra* pp. 76–77, make it clear that the decision of the seller to transfer his business from A to B is valid even though B may have solicited the transfer and even though the seller and B may have agreed before the seller terminates his dealings with A. No case cited to us, and none that we have found, actually go so far as the plaintiff claims. Id. at 78.

*Joseph E. Seagram & Sons, Inc., supra,* has been followed by the Fifth Circuit. See *Aladdin Oil Company v. Texaco, Inc.,* 603 F.2d 1107 (5th Cir.1979).

In *Aladdin Oil, supra,* at 1113, the court stated:

> Only when conserted activity is manifestly anti-competitive are per se rules of illegality applicable. (Citations omitted). Accordingly, a seller has a unilateral right to select its customers and to refuse to sell its goods to anyone, for reasons sufficient to itself.

The courts have repeatedly held that the substitution of one exclusive distributor for another is lawful on the ground that the antitrust laws serve to protect competition, not competitors, and that such substitution does not reduce the number of distributors competing. *Ace Beer Distributors, Inc. v. Kohn, Inc.,* 318 F.2d 283 (6th Cir.1963), *cert. denied,* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963).

Where one distributor has been replaced by another, the defendants have generally been successful in moving for summary judgment on the ground that even if the conspiracy existed, "the object to be achieved was not one rendered obnoxious by the Sherman Act." *Chandler Supply v. GAF Corp., supra; Golden Gate Acceptance Corp. v. General Motors Corp., supra.*

Similarly, in *Burdett Sound, Inc. v. Altec, Corp.,* 515 F.2d 1245, 1249 (5th Cir.1975) the court stated:

> Lest any other former distributors succumb to the temptation of treble damages, we reiterate that it is simply not an antitrust violation for a manufacturer to contract with a new distributor, and as a consequence, to terminate his relationship with a former distributor, even if the effect of a new contract is to seriously damage the former distributor's business.

It should be kept in mind that Zidell is not without recourse. Zidell has pending a cause of action for breach of contract. The courts should not convert ordinary business torts into per se antitrust violations.

I would grant judgment in favor of the defendants on the antitrust action.

I concur in the majority's decision in the breach of contract action.